Julie KEEGAN, Plaintiff,

v.

FIRST BANK OF SIOUX FALLS, Individually and as Executor of the Estate of C.L. Anderson, Deceased, Defendant.

and

Gunnar MERTZ, Petitioner and Appellant,

v.

Robert J. McDOWELL, Defendant and Appellee,

and

Boyce, Murphy, McDowell & Greenfield, Third Party Defendant and Appellee.

No. 18427.

Supreme Court of South Dakota.

Argued March 22, 1994.

Decided July 27, 1994.

Richard A. Johnson, Strange, Farrell, Johnson & Casey, Sioux Falls, Michael D. Klampe of Michael Klampe & Associates, Rochester, MN, for appellant.

David R. Gienapp of Arneson, Issenhuth, Gienapp & Blair, Madison, for appellees.

DOBBERPUHL, Circuit Judge.

Gunnar Mertz (Mertz) appeals a summary judgment granted to defendant, Robert J. McDowell (McDowell) and his law firm,

third-party defendant, Boyce, Murphy, McDowell & Greenfield (the firm) in a cross-claim action by Mertz against McDowell and a third-party claim against the firm for malpractice and breach of fiduciary duty. We reverse and remand.

## PROCEDURAL HISTORY

The lawsuit which gave rise to this appeal was originally brought by Julie Keegan (Keegan) in 1984 against Mertz, McDowell and the estate of C.L. Anderson (Anderson). The suit arose from transactions surrounding a bank in Wibaux, Montana. Keegan had been partners with McDowell and Anderson in the Montana bank prior to Mertz's acquisition of her interest. Mertz later cross-claimed against McDowell and brought a third party complaint against the firm. This pleading, dated February 14, 1986, alleged legal malpractice and breach of fiduciary duty against McDowell and the firm in connection with the Montana bank transactions, and also in connection with transactions surrounding another bank in Lovell, Wyoming.

Keegan's claims surrounding the Montana bank have all been settled, and she is no longer a party to this suit. Only Mertz's claims of malpractice and breach of fiduciary duty against McDowell and the firm remain. The malpractice claims involve several alleged instances surrounding the Montana and Wyoming bank transactions. Mertz argues that an attorney-client relationship was established between himself and McDowell, and sets forth several events which he claims evidence such relationship and give rise to his malpractice claim.

On February 10, 1989, McDowell and the firm moved for summary judgment claiming that Mertz's malpractice claim was barred by the statute of limitations. Then circuit judge, Robert A. Amundson, the original trial judge, denied the motion stating that questions of fact existed concerning: (1) the existence of an attorney-client relationship between McDowell and Mertz; and (2) whether the statute of limitations was tolled by a

continuing attorney-client relationship between them.

On March 23, 1990, after further discovery, McDowell and the firm renewed their summary judgment motion. Judge Amundson took this motion and several others under advisement.[1] Before having a chance to rule on the renewed summary judgment motion, Judge Amundson was appointed to the South Dakota Supreme Court. Judge William J. Srstka was then appointed to hear the case. He however, removed himself from hearing the matter more than a year later. On February 19, 1993, Judge James W. Anderson became the third trial judge to be appointed to the case.

The renewed summary judgment motion of McDowell and the firm was reargued on May 13, 1993. Judge Anderson reversed Judge Amundson's prior order denying summary judgment and granted the renewed motion.

## FACTS

Because a clear understanding of the significant dates, events and transactions is crucial to our decision, a chronology of the same is set forth below.

1. In 1978, McDowell approached friend and client, Keegan inquiring about her interest in becoming partners with himself and Anderson in a bank in Wibaux, Montana.

2. From 1979 to 1981, Mertz and McDowell and the firm established an attorney-client relationship where legal work was done for Mertz personally and for certain corporations with which he was involved.

3. In December of 1980 or January of 1981, Keegan told McDowell that she "wanted out" of the Montana bank.

4. In July of 1981, Mertz was approached by McDowell regarding Mertz's purchase of Keegan's interest in the Montana bank.

5. In December 1981, McDowell arranged a meeting with Mertz and Keegan to memorialize Mertz's acquisition of Keegan's ownership interest in the Montana bank. In connection with this transaction, McDowell pre-

---

1. Mertz was successful on an intermediate appeal to this Court regarding an issue of damages which Judge Amundson had ruled was inadmissable at trial. *See Keegan v. First Bank of Sioux Falls,* 470 N.W.2d 621 (S.D.1991).

pared three documents, an option to purchase stock, a promissory note, and an indemnity agreement. These were dated January 1, 1981,[2] and were signed at the December meeting. McDowell also prepared a letter on the firm's letterhead summarizing the Montana transaction and gave copies to Keegan and Mertz.

6. In February of 1982, McDowell approached Mertz concerning the purchase of Richard Fait's (Fait) ownership interest in a bank in Lovell, Wyoming, which was also owned by McDowell and Anderson. In his negotiations with Fait, Mertz learned for the first time that he was required to obtain approval from the Comptroller of Currency under the federal Change in Bank Control Act of 1978,[3] before change in control of the bank could take place. Upon discovering this, Mertz approached McDowell and Anderson and asked why they had not previously informed him of this regulation, and asked for their help. He was informed that he must write and obtain change in control forms from the government which he did. Mertz experienced great difficulty in preparing the forms and consulted with McDowell regularly concerning their completion but received little help from him. As a result, Mertz's application was filed incorrectly and approval was never forthcoming. On several occasions Mertz and Fait urged McDowell to complete the legal documents necessary to finalize the Wyoming bank transaction. Mertz alleges that McDowell assured them that he would "take care of it" and that they need not worry, but he never followed through with this alleged assurance.

7. In 1983, Mertz, McDowell and Anderson attempted to sell their ownership interest in the Montana and Wyoming banks to Anant Kumar Tripati (Tripati).

8. An "Option Agreement" dated April 15, 1983, was drafted by McDowell for the sale of his and Mertz's interests in the Montana bank to Tripati.

9. In April of 1983, Anderson died unexpectedly. Both Mertz and McDowell negotiated with Tripati subsequent to Anderson's death.

10. In May of 1983 the Comptroller of Currency notified Mertz and McDowell of a pending investigation for alleged violations of federal banking laws in the acquisition and sale of the two banks. When he sought McDowell's advice on how he should respond to the investigation, Mertz alleges that he was told by McDowell that they could "skate around this" by "blaming it on the dead man."

11. On June 22, 1983, Mertz hired separate counsel, but was eventually assessed a $595,000.00 civil money damage penalty by the Comptroller of Currency for willful failure to comply with the act in regard to the Wyoming bank.

12. On February 14, 1986, Mertz brought his cross-claim and third-party complaint against McDowell and the firm.

## ISSUES

1. Do genuine issues of material fact exist as to whether Mertz and McDowell had an attorney-client relationship and whether McDowell committed malpractice within the three year statute of limitations?

2. Did Mertz establish material fact issues on whether McDowell continued to represent him until at least February 14, 1983, which would toll the statute of limitations?

## STANDARD OF REVIEW

Our standard of review for a grant or denial of summary judgment is well settled:

> In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a

---

**2.** Although these documents are dated January 1, 1981, the settled record shows that Mertz was not approached by McDowell concerning this transaction until July of 1981. It does not appear from the record that Keegan or Mertz ever saw these documents until they were signed at the meeting in late December of 1981.

**3.** 12 U.S.C. § 1817 (1988).

matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*Ashby v. Northwestern Public Service Co.,* 490 N.W.2d 286, 288 (S.D.1992); *Waddell v. Dewey County Bank,* 471 N.W.2d 591, 593 (S.D.1991); *Garrett v. BankWest, Inc.,* 459 N.W.2d 833, 836–37 (S.D.1990); *Pickering v. Pickering,* 434 N.W.2d 758, 760–61 (S.D. 1989).

 Statute of limitations questions are normally for the jury. *Schoenrock v. Tappe,* 419 N.W.2d 197, 200 (S.D.1988). Further, summary judgment is proper on the issue of statute of limitations only when *application* of the law is in question. *Kurylas, Inc. v. Bradsky,* 452 N.W.2d 111, 113 (S.D.1990). Summary judgment is therefore improper where there is a *dispute of material fact* which would affect the application of the statute of limitations. *Id.; Schoenrock, supra.*

## DECISION

### I. DO GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER MERTZ AND MCDOWELL HAD AN ATTORNEY–CLIENT RELATIONSHIP AND WHETHER MCDOWELL COMMITTED MALPRACTICE WITHIN THE THREE YEAR STATUTE OF LIMITATIONS?

#### A. *Legal Malpractice/Attorney–Client Relationship*

 The central cause of action in Mertz's cross-claim and third-party complaint against McDowell and the firm is legal malpractice.

In a legal malpractice case, the plaintiff must prove:

1. the existence of an attorney-client relationship giving rise to a duty;

2. that the attorney, either by an act or a failure to act, violated or breached that duty;

3. that the attorney's breach of duty proximately caused injury to the client; and

4. that the client sustained actual injury, loss or damage.

*Haberer v. Rice,* 511 N.W.2d 279, 284 (S.D. 1994). The existence of an attorney-client relationship is usually a question of fact dependent upon the communications and circumstances. *Admiral Merchants v. O'Connor & Hannan,* 494 N.W.2d 261, 265 (Minn. 1992). Mertz has consistently stated that McDowell was his only attorney from the early 1980's until at least April of 1983. There is no dispute that McDowell admits to having performed legal services for Mertz. McDowell, however, claims that for the Montana and Wyoming bank transactions he was not acting as Mertz's attorney, but was "merely a scrivener." The critical fact issue is whether Mertz produced sufficient evidence to present a jury issue that he and McDowell had an attorney-client relationship with regard to the two bank transactions.

 As a general rule, an attorney-client relationship is ordinarily created by contract, but it is not necessary that the contract be express, or that a retainer be paid; a contract may be implied from the conduct of the parties. *Steinbach v. Meyer,* 412 N.W.2d 917, 918 (Iowa App.1987). An attorney-client relationship is created under the "contract theory" when: (1) a person seeks advice or assistance from an attorney; (2) the advice or assistance sought pertains to matters within the attorney's professional competence; and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance. *Steinbach, supra; Patterson v. Swarr, May, Smith & Anderson,* 238 Neb. 911, 473 N.W.2d 94, 100 (1991); *McVaney v. Baird, Holm, McEachen, et al.,* 237 Neb. 451, 466 N.W.2d 499, 506 (1991); *see TJD Dissolution Corp. v. Savoie Supply Co., Inc.,* 460 N.W.2d 59, 62 (Minn.App.1990); *Security Bank v. Klicker,*

142 Wis.2d 289, 418 N.W.2d 27, 30 (App. 1987).

In reviewing summary judgments, we are required to view all inferences most favorably to the nonmoving party, Mertz, in this case. Viewing all inferences most favorably to Mertz, a jury could reasonably conclude that McDowell's actions established an attorney-client relationship with Mertz. It is a question of fact whether McDowell's actions were those of a "mere scrivener" or those of an attorney acting for his client.[4]

### B. *Statute of Limitations*

■ We have consistently held that our statute of limitations for legal malpractice found at SDCL 15-2-14.2[5] is an "occurrence rule" rather than a "discovery" or "date of damage rule." *Haberer,* 511 N.W.2d at 287; *Shippen v. Parrott,* 506 N.W.2d 82, 85 (S.D. 1993); *Bradsky, supra,* 452 N.W.2d at 113–15; *Schoenrock, supra,* 419 N.W.2d at 199–200; *Hoffman v. Johnson,* 374 N.W.2d 117, 122 (S.D.1985). Under the occurrence rule, absent an attorney's fraudulent concealment of his or her negligent advice, the statute of limitations on a claim of attorney malpractice begins to run at the time of the alleged negligence and not from the time when the negligence is discovered or the consequential

damages are imposed. *Haberer, supra; Bradsky, supra; Schoenrock, supra; Hoffman, supra; Shippen, supra.* We are to look at what *act or omission* starts the clock running under the instant facts for statute of limitations purposes. *Bradsky, supra,* 452 N.W.2d at 114. Because Mertz's cross-claim and third-party complaint against McDowell and the firm is dated February 14, 1986, the question becomes whether all of McDowell's alleged negligent acts or omissions occurred *prior to February 14, 1983.* If so, the occurrence rule would preclude Mertz's malpractice claim.

■ McDowell and the firm, in effect, argue that the allegations made by Mertz relating to McDowell's malpractice all occurred in 1981 or 1982 (prior to February 13, 1983), and that the occurrence rule therefore precludes Mertz's claim. Conversely, Mertz contends that the continuous representation doctrine[6] effectively tolled the statute of limitations. Mertz argues that McDowell continued to represent and advise him regarding the bank transactions until at least April 15, 1983, when McDowell drafted an "Option Agreement" for the sale of their respective interests in the Montana bank.

Although we agree that the *initial* acts or omissions[7] of McDowell occurred in 1981 and

---

4. Long ago this Court defined "attorney" as follows:

Now the word "attorney," when used in connection with the proceedings of courts and the authority to conduct business in them, as well as when employed in a general sense with reference to the transaction of business usually, and almost necessarily, confided to members of the legal profession, has a fixed and universal signification on which the technical and proper sense unite. The legislator and the judge, the lawyer and the layman, understand it alike as having reference to a class of persons who are by license constituted officers of courts of justice, and who are empowered to appear and prosecute and defend, and upon whom peculiar duties, responsibilities, and liabilities are devolved by law in consequence. *Danforth v. Egan,* 23 S.D. 43, 52, 119 N.W. 1021, 1025 (1909). In contrast, a "scrivener" is defined as a "writer; scribe; conveyancer. One whose occupation is to draw contracts, write deeds and mortgages, and prepare other species of written instruments." *Black's Law Dictionary* 1209 (5th ed. 1979).

Based upon these definitions, a jury could reasonably conclude that McDowell's actions in drafting legal documents and rendering legal advice to Mertz established an attorney-client relationship between them and went far beyond the acts of a "mere scrivener."

5. SDCL 15-2-14.2 reads as follows:

An action against a licensed attorney, his agent or employee, for malpractice, error, mistake or omission, whether based upon contract or tort, can be commenced only within three years after the alleged malpractice, error, mistake or omission shall have occurred. This section shall be prospective in application.

6. The continuous representation doctrine is discussed later in this opinion.

7. We express no opinion on the question of whether McDowell's actions were, in fact, negligent. This Court is deciding only the peripheral question of whether an action for his *alleged* negligence may be barred by the statute of limitations.

1982,[8] thereby starting the running of the statute of limitations, we also find that the facts, when viewed most favorably to Mertz, raise genuine issues ·concerning whether McDowell continued to represent Mertz until at least February 14, 1983, thereby tolling the limitations period.

## II. DID MERTZ ESTABLISH MATERIAL FACT ISSUES ON WHETHER MCDOWELL CONTINUED TO REPRESENT HIM UNTIL AT LEAST FEBRUARY 14, 1983, WHICH WOULD TOLL THE STATUTE OF LIMITATIONS?

### A. *The Continuous Representation Doctrine*

 Mertz raises the continuous representation doctrine as a defense to the statute of limitations. Under this doctrine, the running of the statute of limitations for legal malpractice is tolled until the "representation" terminates. We first extended the medical continuing treatment doctrine to legal malpractice actions in *Schoenrock*, 419 N.W.2d 197. We reaffirmed that decision two years later in *Bradsky*, 452 N.W.2d 111, where we stated:

*Schoenrock, supra,* is important because it notes that the act or omission begins the running whether the act could have been

later cured or not. *Of course, if an attorney is under a duty to correct the act because he or she is continuing to represent the client on the same matter then the statute of limitations is tolled.* (emphasis added).

*Id.* at 115. We apply the continuous representation doctrine to legal malpractice actions when there is a: ·

"[C]lear indicia of an ongoing, continuous, developing, and dependent relationship between the client and the attorney...." This relationship is one "which is not sporadic but developing and involves a continuity of the professional services from which the alleged malpractice stems." Furthermore, the application of this doctrine should only be applied where the "professional's involvement after the alleged malpractice is for the performance of the same or related services and is not merely continuity of a general professional relationship."

*Id.* (quoting *Schoenrock,* 419 N.W.2d at 201). Most importantly, to effectively toll the statute, the continuous representation must occur *within the three year period of limitations.* *Schoenrock,* 419 N.W.2d at 201–02.

 Both sides cite *Schoenrock* and *Bradsky* as authority for their respective arguments.[9] However, unlike those two cases,

---

8. At page 15 of his brief, McDowell concedes that he prepared certain legal documents for Mertz's purchase of Keegan's interest in the Montana bank in 1981; that Mertz failed to get government approval under the Change in Bank Control Act for the Wyoming bank in 1981 or 1982; that he failed to prepare a buy/sell agreement for Mertz relating to the purchases of the two banks in 1981; and that he failed to advise Mertz to seek independent advice of counsel in 1981.

9. In *Schoenrock,* the client hired an attorney to perform a single, specific transaction, a title examination on a parcel of land the client had purchased. No other attorney-client relationship existed between the two. Attorney prepared the title opinion, but failed to mention that the property was subject to an easement. Client subsequently sued attorney for legal malpractice. Attorney moved for summary judgment, claiming that the statute of limitations had run on the cause of action. When the lawsuit was commenced, over four years had passed since attorney rendered the title opinion and there had been a three year and seven month gap between attorney's title opinion and the next contact be-

tween the parties. In affirming summary judgment, this Court found no indicia of an on-going, continuous attorney-client relationship and refused to toll the statute of limitations.

*Bradsky* also involved a single, specific negligent act by the attorney. There, client brought a legal malpractice action against attorney for failing to file a financing statement. In addition, within eight months of the subject negligent act, attorney escorted client to another law firm which was to represent client on the matter in question. Some nine or ten months later, client completely discharged the defendant attorney and the second firm and hired a third firm to represent him. In again affirming summary judgment for the attorney, we held that although the second firm continued to contact the defendant attorney, the contacts did not establish a continuing relationship on the matter in question between the client and the defendant attorney; that no clear indicia of an ongoing, continuous, developing, and dependent relationship between attorney and client was present; and the evidence did not show any relationship between the professional services and the alleged omissions.

the case at hand involves more than one specific alleged negligent act. Two factors to be considered in determining whether the attorney-client relationship continued or was terminated as a result of these multiple acts are: (1) whether Mertz, as a reasonable layman, believed that McDowell was to do more work; and (2) whether anything occurred to destroy the essential trust and confidence between the attorney and client. *Schoenrock,* 419 N.W.2d at 205 (Henderson, J., dissenting). These factors are for the jury to apply. *Id.*

Mertz claims that McDowell continuously represented him until at least April 15, 1983. Mertz presented deposition testimony where he stated that McDowell and the firm were the only attorneys that he utilized between approximately 1979 and 1985. Further, by way of his 1/30/89, affidavit, Mertz testified that "from the Summer of 1981, up through April or May of 1983, [he] consulted with and discussed the Wibaux Bank and the Lovell Bank purchase and business operations on virtually a weekly basis with Robert J. McDowell." Mertz also presented evidence through his expert witness, attorney Mary Curtin, that until the attorney-client relationship was terminated, McDowell and the firm had an on-going, continuous duty to inform, correct and/or cure their negligent acts.

While the foregoing evidence clearly establishes genuine issues of material fact concerning the applicability of the continuous representation doctrine, the following deposition testimony is most relevant to the existence of a continuing attorney-client relationship between Mertz and McDowell:

Q. [by Mr. Butler, attorney for Plaintiff Keegan] I believe I just showed you an Exhibit that we just marked and that was a document entitled option agreement?

A. [by McDowell] That is correct.

Q. Do you recognize that document?

A. I do.

Q. Bears a date of April 15, 1983?

A. That's correct.

Q. Is it your memory that that is the date on which the document was signed?

A. Could very well be.

Q. Who drew the document?

A. I did.

Q. It has to do with the giving of an option to Mr. Tripati for the purchase of Mr. Mertz's interest in the bank at Wibaux along with your interest, right?

A. Yes. I don't think it was really going to go to Tripati, I think it was going to go to one of his corporations.

Certainly, a jury could reasonably conclude that this testimony presents a "clear indicia of an ongoing, continuous, developing, and dependent relationship between the client and the attorney."

In oral argument to this Court, McDowell and the firm argued that the Montana and Wyoming bank deals were separate and distinct transactions, therefore having separate statute of limitations periods. In turn, they argued, that even if the April 15, 1983, option agreement on the Montana bank is found to toll the limitations period, it would only toll the limitations period on the Montana bank transaction, while the limitations period on the Wyoming bank transaction would continue to run. We find this argument to be without merit. Even assuming *arguendo* that the bank transactions were separate and distinct, we note that part of Mertz's malpractice claim is that McDowell failed to assist him in preparing the necessary documents required by the Comptroller of Currency under the federal Change in Bank Control Act of 1978, resulting in the assessment of a civil damage penalty for willful failure to comply with the act in regard to the *Lovell, Wyoming bank. See Keegan v. First Bank of Sioux Falls,* 470 N.W.2d at 622. In his 1/30/89, affidavit, Mertz testified as to receiving the following advice from McDowell:

In *May of 1983,* I received written notice from the Comptroller of Currency that I may have civil penalties assessed against me for violation of banking regulations. Thereafter, I contacted Robert J. McDowell to seek his advice regarding what I should do. His response to my inquiry was essentially as follows: *"I think we can skate around this. Just remember, blame it on the dead man."* (emphasis added).

Again, a jury could reasonably conclude that McDowell continued to represent Mertz by giving him such advice, thus tolling the limitations period on the *Wyoming bank transaction* as well.

 Mertz has the burden to establish the applicability of the continuous representation doctrine. *Bradsky,* 452 N.W.2d at 117.

> In summary judgment proceedings where the defendant asserts the statute of limitations as a bar to the action, and presumptively establishes the defense by showing the case was instituted beyond the statutory period, the burden then shifts to the plaintiff to establish the existence of material facts in avoidance of the statute of limitations, e.g., fraudulent concealment of the cause of action.

*Conway v. Conway,* 487 N.W.2d 21, 23 (S.D. 1992); *Bradsky, supra; Glad v. Gunderson, Farrar, Aldrich & DeMersseman,* 378 N.W.2d 680, 682 (S.D.1985); *see McMahan v. Snap On Tool Corp.,* 478 N.E.2d 116, 120 (Ind.App.1985); *Conard v. Waugh,* 474 N.E.2d 130, 134–35 (Ind.App.1985). This will apply to the continuous representation doctrine as well. Thus, Mertz will bear the same burden whether trying to toll the statute of limitations by using the continuous representation doctrine or fraudulent concealment. *Bradsky, supra.*

The testimony of Mertz and his expert witness, Mary Curtin, along with the testimony of McDowell effectively overcomes the presumption that the statute of limitations has run. A genuine issue of fact exists on whether there was an attorney-client relationship between Mertz and McDowell and whether the statute of limitations was tolled by a continuing attorney-client relationship. These fact issues, in turn, affect the application of the limitations period. Summary judgment was therefore improper and the decision of the trial court is reversed and remanded for further proceedings.

Finally, as a third issue, Mertz argues that genuine issues of material fact exist on whether McDowell breached a fiduciary duty to Mertz. This issue was not addressed or ruled upon by the trial court and will not be addressed by this Court for the first time on appeal. *Keegan v. First Bank of Sioux Falls,* 470 N.W.2d at 624.

MILLER, C.J., HENDERSON, J., and KONENKAMP and JOHNSON, Circuit Judges, concur.

DOBBERPUHL, Circuit Judge, for WUEST, J., disqualified.

KONENKAMP, Circuit Judge, for SABERS, J., disqualified.

JOHNSON, Circuit Judge, for AMUNDSON, J., disqualified.