482 S.E.2d 115

William E. SMITH, D. Ray Smith, and Smith Company, A Corporation, Plaintiffs Below, Appellants

v.

Charles B. STACY, d/b/a Spilman, Thomas & Klostermeyer, A Law Firm, Defendant Below, Appellee.

No. 23196.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 24, 1996.

Decided Dec. 19, 1996.

Rudolph L. DiTrapano, Sean P. McGinley, DiTrapano & Jackson, Charleston, for Appellants.

**500**

Anita R. Casey, Meyer, Darragh, Buckler, Bebenek & Eck, Charleston, for Appellee.

WORKMAN, Justice:

This is an appeal by William E. Smith, D. Ray Smith, and Smith Company (hereinafter "the Appellants" or "the Smiths") from a final order of the Circuit Court of Kanawha County, which entered judgment in favor of the defendant below, Charles B. Stacy, d/b/a/ Spilman, Thomas, Battle & Klostermeyer (hereinafter "the Appellee").[1] The Appellants had attempted to institute a civil action for breach of contract and legal malpractice against the Appellee, and the lower court granted summary judgment in favor of the Appellee on December 1, 1994. The Appellants appeal to this Court, and we[2] reverse the decision of the lower court and remand for further proceedings consistent with this opinion.

## I. Factual History

Appellants William E. Smith and D. Ray Smith were the sole officers and shareholders of Cunningham Memorial Park, Inc.,[3] through which they owned and operated a St. Albans cemetery. In November 1983, the Smiths hired Mr. John D. Stump as an independent contractor to solicit sales of cemetery requirements, such as grave plots, mausoleum space, memorials, and markers. A November 1984 written agreement, purporting to memorialize the arrangement of the parties, accorded Mr. Stump the "exclusive right" to sell "pre-need" cemetery items in exchange for a commission on each sale. The agreement also provided Mr. Stump an "exclusive option" to purchase the assets of the corporation if the Smiths decided to sell them while the agreement was in effect.

In 1984, Mr. Stump formed John D. Stump & Associates, Inc., and Mr. Stump personally retained the option rights under the agreement with the Smiths. In March 1985, the Smiths offered to sell the cemetery assets to Mr. Stump for $3.5 million or the cemetery corporate stock for $3.0 million. Both offers were for cash transactions. Mr. Stump rejected the offer, but stated that he would be interested if the property were offered at a lower price.

In 1986, Mr. William E. Rowe offered the Smiths $1.5 million dollars to purchase the cemetery. Aware of the "exclusive option" to purchase which existed with Mr. Stump, the Smiths retained the Appellee to determine the requirements for compliance with that agreement. Subsequent to consultation with the Appellee, the Smiths offered to sell the cemetery corporate stock to Mr. Stump for $1.5 million. In a March 7, 1986, responsive letter, Mr. Stump rejected that offer, but reserved the right to make a counteroffer. By letter dated March 19, 1986, Mr. Stump's attorney notified the Smiths of Mr. Stump's claim that the Smiths owed him over $77,000 in commissions.

In a March 25, 1986, letter, the Smiths notified Mr. Stump that the previous offer to sell the cemetery stock had been withdrawn. Instead, they offered to sell him the assets of the cemetery corporation for $1.1 million upon condition that he assume the liabilities of the corporation and pay an additional $400,000 for a ten-year covenant not to compete.

By letter dated April 3, 1986, Mr. Stump responded that he was willing to accept the offer "subject to my being able to secure suitable financing[.]" Mr. Stump also stated, however, that he had "no need of a non-competitive agreement. Under the language of the [agreement] there was no contemplation of any payment for a non-competitive clause and such clause cannot be considered an asset of the corporation."

---

1. It is noted that the name of the Appellee's law firm has changed to Spilman, Thomas & Battle.

2. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

3. Cunningham Memorial Park, Inc., was succeeded by Smith Company, and the individual and corporate Appellants will be referred to collectively as "the Appellants" or "the Smiths."

After consultation and advice from the Appellee, the Smiths responded in an April 7, 1986, letter advising Mr. Stump that the agreement did not provide for conditional acceptance of an offer and repeated that the covenant not to compete was "an integral part of the offer and of the proposed transaction. . . ." In that April 7, 1986, letter, the Smiths informed Mr. Stump that his response could not properly be considered an acceptance and that the Smiths had sold the corporate assets to Mr. Rowe.

On April 7, 1986, the Smiths and Mr. Rowe executed an asset purchase contract transferring all cemetery assets to Mr. Rowe, with the exception of the pre-need sales contract with Mr. Stump. The asset purchase contract contemplated a cash down payment of $200,000 and the issuance of promissory notes payable over a period of years. Mr. Rowe agreed to assume all corporate liabilities, except those under the pre-need sales contract, and to pay the Smiths $400,000 over a period of ten years, without interest,[4] for the covenant not to compete.

On December 22, 1986, Mr. Stump instituted a civil action against the Smiths and Mr. Rowe in the Circuit Court of Kanawha County. The complaint alleged that the Smiths had failed to honor Mr. Stump's exclusive right to sell pre-need items by failing to pay him proper commissions, that the Smiths had interfered with his "exclusive option" to purchase the cemetery by refusing his "acceptance" of the March 25, 1986, offer, and that Mr. Rowe had tortiously interfered with Mr. Stump's contract rights and was thereby unjustly enriched. Mr. Rowe subsequently settled with Mr. Stump and was dismissed from the case. The Appellee and his law firm performed all discovery and pretrial preparation for two and one-half years.

On July 26, 1989, the Appellee's firm informed the Smiths that Mr. Stump's attorney had orally stated his belief that Mr. Stacy had committed legal malpractice. The firm also informed the Smiths that Mr. Stump's attorney, when questioned about the oral accusations, had responded by denying that he had made such an allegation. The July 26, 1989, letter also advised the Smiths as follows: "Needless to say, Mr. Stacy did not commit legal malpractice[.]" A second letter from the Appellee's firm to the Smiths, dated August 18, 1989, discussed the merit of the potential allegations of legal malpractice by Mr. Stacy. That letter stated that the allegations of malpractice were "vague and nonspecific," and dismissed the allegations as "substantively groundless."

On September 14, 1989, the Appellee's firm recommended that the Appellants pay Mr. Stump $500,000 to settle the case. The Appellants sought a second opinion and retained the firm of DiTrapano and Jackson to assume the Appellants' defense. Subsequent to a July 9, 1990, trial, the jury found for Mr. Stump and awarded him $92,750 on his claim for unpaid sales commissions and $249,244 on his claim regarding the sale of the cemetery to Mr. Rowe. By order dated October 29, 1990, the circuit court denied the Smiths' motions for judgment notwithstanding the verdict, for new trial, and to alter or amend the judgment.

The Smiths appealed that decision to this Court, and in *John D. Stump & Associates, Inc. v. Cunningham Memorial Park, Inc.*, 187 W.Va. 438, 419 S.E.2d 699 (1992), we reversed the judgment of the lower court and awarded a new trial. Recognizing that "an acceptance of a contractual offer must be unequivocal and unconditional and may not introduce additional terms and conditions . . . ," we reasoned that in Mr. Stump's April 3, 1986, letter to the Smiths,

> Mr. Stump rejected any purchase of a covenant not to compete and conditioned his acceptance of the rest of the offer on his ability to obtain financing. This was not a clear and unequivocal acceptance of the Smiths' offer to sell, and, therefore, as a matter of law, the Smiths could reject his response, as they did in their April 7, 1986 letter.

187 W.Va. at 444, 419 S.E.2d at 705. We remanded for a new trial on the issue of

---

4. The Smiths also assert that the Appellee failed to inform them that the present value of a $400,-000 cash payment paid over ten years without interest would reduce the ultimate amount received as a purchase price.

disputed sales commissions.[5] With regard to the viability of Mr. Stump's alleged "acceptance" of the offer, however, we made our determination without requiring remand for disposition of the matter.

Before the opinion issued from this Court, the Smiths filed a complaint in the lower court. The August 23, 1991, complaint alleged that the Appellee had breached its contract and had committed legal malpractice during the course of representation of the Smiths. Specifically, the Smiths assert that their attorney, Appellee Charles B. Stacy, committed malpractice by failing to forward to Stump the exact terms and conditions of the last proposal made to Rowe and by failing to attempt to obtain a release from Stump. They also allege that the Appellee failed to advise them of the diminution in value of the interest free payments for the covenant not to compete. Additionally, the Appellants contend that Mr. Stacy should not have continued to represent them because Mr. Stacy would be a material witness in the case instituted by Mr. Stump against the Appellants. They further allege that the Appellee's firm, through the letters dated July 26, 1989, and August 18, 1989, as discussed above, provided the Smiths with information which led them to believe that they had no cause of action against Mr. Stacy for legal malpractice.

On October 7, 1993, the Appellee moved for summary judgment based upon the statute of limitations applied to tort cases.[6] The Smiths maintained that their action sounded in contract, but that even the two-year tort statute of limitations had not expired. Subsequent to oral argument, the lower court concluded that the Appellees were entitled to summary judgment based upon the expiration of the two-year statute of limitations and that the action sounded in tort rather than in contract. The Smiths now appeal that order to this Court.[7]

**II. Applicable Statute of Limitations**

■ While several substantial issues were raised in the complaint below, our task is limited to the determination of the applicable statute of limitations period, and thus we do not reach the substantive issue of whether legal malpractice was committed. We also note that our review of the lower court's determination of summary judgment is de novo. " 'A circuit court's entry of summary judgment is reviewed *de novo.*' Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994)." Syl. Pt. 1, *Jones v. Wesbanco Bank Parkersburg*, 194 W.Va. 381, 460 S.E.2d 627 (1995).

■ We first address the Appellants' contention that this matter sounds in contract and is therefore not subject to the two-year statute of limitations applicable to tort actions. As we explained in syllabus point one of *Hall v. Nichols*, 184 W.Va. 466, 400 S.E.2d 901 (1990):

"Unless a complaint in a malpractice action against an attorney sounds only in tort, such action may be brought on contract or in tort and the fact that the statute of limitations bars the tort action does not

5. Mr. Stump alleged that he was entitled to commissions on all pre-need sales, not only those generated by the solicitations of Mr. Stump or his staff. We found that the jury had received conflicting instructions on the issue of the exclusivity of sales of pre-need cemetery items and the commissions derived therefrom. We therefore remanded the matter for a new trial on that issue alone.

6. Within that motion, the Appellee also asserted that our opinion in *Stump* foreclosed further examination of the issue of attorney malpractice and that the Smiths were collaterally estopped from pursuing their claim. The Smiths responded by asserting that Mr. Stacy was not a party to the action filed by Mr. Stump and that this Court did not hold as a matter of law that the notice provided by Mr. Stacy to Mr. Stump was suffi-

cient. In the December 1, 1994, final order of the lower court, the issue of collateral estoppel and the effect of this Court's decision upon the proceedings were not addressed. The lower court's decision turned upon the issue of the statute of limitations and the conclusion that all the Smiths' claims sounded in tort, rather than contract. The effect of our *Stump* decision upon the Smith's malpractice claim was not ruled upon by the lower court, and we do not address it here. Nor do we in any way address the underlying issue of whether any malpractice occurred.

7. The Appellants specifically present only two issues for our resolution: (1) whether the causes of action sound in tort or contract, and (2) whether the claims are barred by the statute of limitations.

preclude an action on contract which is not barred by the applicable limitation statute." Syllabus, *Harrison v. Casto*, 165 W.Va. 787, 271 S.E.2d 774 (1980).

In syllabus point two of *Hall*, we continued:

Where the act complained of in a legal malpractice action is a breach of specific terms of the contract without reference to the legal duties imposed by law on the attorney/client relationship, the action is contractual in nature. Where the essential claim of the action is a breach of duty imposed by law on the attorney/client relationship and not of the contract itself, the action lies in tort.

With regard to general interpretation, rather than the more limited attorney malpractice arena, we explained in syllabus point one of *Cochran v. Appalachian Power Co.*, 162 W.Va. 86, 246 S.E.2d 624 (1978), that "[a] complaint that could be construed as being either in tort or on contract will be presumed to be on contract whenever the action would be barred by the statute of limitation if construed as being in tort." 162 W.Va. at 87, 246 S.E.2d at 625.

■ The complaint in the case sub judice alleges that the Smiths employed Mr. Stacy "to represent their interest in the sale and to assure that 'Stump' was given whatever rights he had under the 'right of first refusal' to purchase the cemetery." Thus, there is a particular allegation that the underlying agreement was premised upon the clients' desire to gain specific advice regarding the proper compliance with the right of first refusal given to Mr. Stump. The Smiths allege that this agreement constitutes an oral contract for a specific legal services, taking whatever action necessary to comply with the right of first refusal. Indeed, the complaint could also be interpreted to allege breach of the more general duties imposed upon the

attorney/client relationship, but the fact of allegation of breach of a precise and definite purpose of the original retention of the attorney remains. As we explained in syllabus point one of *Cochran*, quoted above, where the contract could reasonably be construed as being in tort or on contract and construction as a tort action would result in dismissal due to the statute of limitations, the action will be construed as being on contract. 162 W.Va. at 87, 246 S.E.2d at 625. We therefore conclude that this action sounds in tort and contract and should not be precluded by a tort statute of limitations.

## III. Continuous Representation Doctrine

■ More central to our final analysis, however, is the issue of continued representation by the Appellee's law firm and the effect of that representation upon the running of the statute of limitations. The Appellant proposes the adoption of the continuous representation doctrine designed to toll the statute of limitations during the continuation of the attorney/client relationship. This doctrine tolls the running of the statute in an attorney malpractice action until the professional relationship terminates with respect to the matter underlying the malpractice action. It is an adaptation of the "continuous treatment" rule applied in the medical malpractice [8] forum and is designed, in part, to protect the integrity of the professional relationship by permitting the allegedly negligent attorney to attempt to remedy the effects of the malpractice and providing uninterrupted service to the client. *See Cuccolo v. Lipsky, Goodkin & Co.*, 826 F.Supp. 763, 769–70 (S.D.N.Y.1993) (outlining policy considerations underlying the doctrine). In *Glamm v. Allen*, 57 N.Y.2d 87, 453 N.Y.S.2d 674, 439 N.E.2d

---

**8.** The rationale of the "continuous representation" doctrine is explained in *Huysman v. Kirsch*, 6 Cal.2d 302, 57 P.2d 908 (1936), quoting *Gillette v. Tucker*, 67 Ohio St. 106, 65 N.E. 865, 871 (1902), as follows:

"Indeed, it would be inconsistent to say that the plaintiff might sue for her injuries while the surgeon was still in charge of the case, and advising and assuring her that proper patience would witness a complete recovery. It would be trifling with the law and the courts to exact

compliance with such a rule, in order to have a standing in court for the vindication of her rights. It would impose upon her an improper burden to hold that, in order to prevent the statute from running against her right of action, she must sue while she was following the advice of the surgeon, and upon which she all the time relied."

57 P.2d at 911. We reserve for some other day an examination of whether the rule should likewise apply in the medical malpractice context.

390 (1982), the court indicated that since it would be "impossible to envision a situation where commencing a malpractice suit would not affect the professional relationship, the rule of continuous representation tolls the running of the Statute of Limitations on the malpractice claim until the ongoing representation is completed." *Id.* 453 N.Y.S.2d at 677, 439 N.E.2d at 393.

## A. Requirement of Continuity of Same or Related Service

In *Muller v. Sturman*, 79 A.D.2d 482, 437 N.Y.S.2d 205 (N.Y.App.Div.1981), the court explained that the continuous representation doctrine applies only where there are "clear indicia of an ongoing, continuous, developing and dependent relationship between the client and the attorney...." *Id.* 437 N.Y.S.2d at 208. The doctrine should be applied only where the "professional's involvement after the alleged malpractice is for the performance of the same or related services and is not merely continuity of a general professional relationship." *Id.* at 207. The doctrine "envisions a relationship between the parties that is marked with trust and confidence ... [and] involves a continuity of the professional services from which the alleged malpractice stems." *Id.* at 208.

■ Based upon these principles, we hold that the limitations period for a legal malpractice claim is not tolled by the continuous representation rule where an attorney's subsequent role is only tangentially related to legal representation the attorney provided in the matter in which he was allegedly negligent. Therefore, "[t]he inquiry is not whether an attorney-client relationship still exists on any matter or even generally, but when the representation of the specific matter concluded." Ronald E. Mallen and Jeffrey M. Smith, *Legal Malpractice* § 21.12, at 822 (4th ed.1996).

North Dakota has also adopted this rule, reasoning that it has the dual purpose of protecting the relationship as well as protecting the client from the possibility of barring his cause of action by delay. In *Wall v. Lewis*, 393 N.W.2d 758 (N.D.1986), the court held: "We believe that the continuous representation rule appropriately protects the integrity of the attorney-client relationship and

affords the attorney an opportunity to remedy his error (or to establish that there has been no error), while simultaneously preventing the attorney from defeating the client's cause of action through delay." 393 N.W.2d at 763. The *Wall* court also specified that the doctrine was applicable only where the "representation relates to the same transaction or subject matter as the allegedly negligent acts." *Id.* at 762.

In *Bosse v. Quam*, 537 N.W.2d 8 (S.D. 1995), the Supreme Court of South Dakota addressed the continuous representation rule and noted that the rule, as applied to legal malpractice, has its roots in the medical malpractice exception to the statute of limitations. The statute is tolled for torts arising from a physician's continued treatment until the doctor-patient relationship has ended; likewise, the continuous representation rule in the legal malpractice arena halts the commencement of the limitations period until the attorney-client relationship has ended. 537 N.W.2d at 10–11. In *Keegan v. First Bank of Sioux Falls*, 519 N.W.2d 607 (S.D.1994), the court specifically placed the burden upon the client to establish the applicability of the continuous representation doctrine as a defense to the statute of limitations claims potentially asserted by the attorney. *Id.* at 615.

In *Morrison v. Watkins*, 20 Kan.App.2d 411, 889 P.2d 140 (1995), the court emphasized that the applicability of the continuous representation rule ceases when the attorney/client relationship terminates. "Where the client does hire another attorney, and assumes an adversarial stance to her first attorney, the continuous representation terminates, even if the client does not formally fire the first attorney." *Id.* 889 P.2d at 148.

The Supreme Court of Kentucky justifies application of the rule by reference to the underlying discovery rule, reasoning that the continuous representation rule is simply a "branch of the discovery rule," which holds that "by virtue of the attorney-client relationship, there can be no effective discovery of the negligence so long as the relationship prevails." *Alagia, Day, Trautwein & Smith v. Broadbent*, 882 S.W.2d 121, 125 (Ky.1994). The rule "recognizes the attorney's superior knowledge of the law and the dependence of the client, and protects the client from an

unscrupulous attorney." *Id.* The "practical advantage" of the rule is to enable a negligent attorney "to correct or mitigate the harm if there is time and opportunity and if the parties choose such a course. Without it, the client has no alternative but to terminate the relationship, perhaps prematurely, and institute litigation." *Id.; see also Northern Mont. Hosp. v. Knight,* 248 Mont. 310, 811 P.2d 1276 (1991) (applying the continuous representation rule to architects); *Zwecker v. Kulberg,* 209 A.D.2d 514, 618 N.Y.S.2d 840 (1994) (applying the rule to accountants).

The United States District Court for the Southern District of West Virginia, in *Tolliver v. United States,* 831 F.Supp. 558 (S.D.W.Va.1993), has adopted the continuous treatment rule in the medical malpractice context, reasoning that in order to avoid depriving a medical patient of the right to place trust and confidence in the physician, the solution is to excuse the patient from challenging the quality of care until the confidential relationship terminates, to toll the statute's running during this period. *Id.* at 560. The doctrine of continuous treatment in the medical malpractice arena was also adopted by the Fourth Circuit in *Miller v. United States,* 932 F.2d 301 (4th Cir.1991), and *Otto v. National Institute of Health,* 815 F.2d 985 (4th Cir.1987).

 Similar reasoning was employed in another context by this Court in *Clark v. Milam,* 192 W.Va. 398, 452 S.E.2d 714 (1994). We addressed the tolling of the statute of limitations for corporate claims against lawyers who previously represented the corporation adversely controlled by officers and directors who had retained the lawyers. We stated the following in syllabus point one:

> In West Virginia, the doctrine of adverse domination tolls statutes of limitation for tort claims against officers and directors who acted adversely to the interests of the company and against lawyers and accountants, owing fiduciary duties to the company, who took action contributing to the adverse domination of the company.

*Id.* at 399, 452 S.E.2d at 715.

In discussing the implications of the rule, the following observations were made by Mallen and Smith:

The purpose of the continuous representation rule is to avoid unnecessarily disrupting the attorney-client relationship. Adoption of the rule was a direct reaction to the illogical requirement of the occurrence rule, which compels clients to sue their attorneys although the relationship continues and there has not been and may never be any injury. The rule, limited to the context of continuous representation, also is consistent with the purpose of the statute of limitations, which is to prevent stale claims and enable the defendant to preserve evidence. When the attorney continues to represent the client in the subject matter in which the error has occurred, all such objectives are achieved and preserved. The attorney-client relationship is maintained and speculative malpractice litigation is avoided.

The rule of continuous representation is available and appropriate in those jurisdictions adopting the damage and discovery rules. The policy reasons are as compelling for allowing an attorney to continue efforts to remedy a bad result, even if some damages have occurred and even if the client is fully aware of the attorney's error. The doctrine is fair to all concerned parties. The attorney has the opportunity to remedy, avoid or establish that there was no error or attempt to mitigate the damages. The client is not forced to end the relationship, although the option exists. This result is consistent with any expressed policy basis for the statute of limitations.

Mallen and Smith, *supra,* § 21.12, at 817 (footnotes omitted).

## B. Client's Knowledge of Allegedly Negligent Act

As recognized by Mallen and Smith, quoted above, the rationale underlying the continuous representation doctrine supports application of the doctrine even where the client has actual knowledge of the allegedly negligent act. Quite obviously, nothing about the continuous representation doctrine limits the client's ability to terminate the attorney/client relationship upon learning of the attorney's allegedly inappropriate endeavor or to immediately institute a cause of action

against the attorney. Thus, applying the doctrine, even where the client has knowledge of the act, will not prejudice the rights of the client to obtain redress.

The continuous representation doctrine was expressly approved and codified in California in 1977 at section 340.6, subdivision (a) of the Code of Civil Procedure. In its statutory form, the limitations period will not begin to run during the continuous representation "regarding the specific subject matter in which the alleged wrongful act or omission occurred" even when the client is fully aware of both the attorney's negligence and the resulting harm. Cal. Civil Procedure § 340.6 (West 1982). In *Laird v. Blacker*, 2 Cal.4th 606, 7 Cal.Rptr.2d 550, 828 P.2d 691, *cert. denied*, 506 U.S. 1021, 113 S.Ct. 658, 121 L.Ed.2d 584 (1992), the Supreme Court of California relied upon the language of the statute and reasoned as follows:

> Section 340.6 and its legislative history make clear that once a client has been injured by an adverse judgment, the limitations period commences and is not tolled by filing an appeal absent continuous representation by the trial attorney. This "continuous representation" rule was adopted in order to "avoid the disruption of an attorney-client relationship by a lawsuit while enabling the attorney to correct or minimize an apparent error, and to prevent an attorney from defeating a malpractice cause of action by continuing to represent the client until the statutory period has expired." (Sen. Com. on Judiciary, 2d reading analysis of Assem. Bill No. 298 (1977–1978 Reg. Sess.) as amended May 17, 1977.)

7 Cal.Rptr.2d at 557, 828 P.2d at 698 (citations omitted).

In *Morrison*, the Kansas court recognized that "[a]t least one court has held that the continuous representation rule is not applicable when the client learns of the attorney's negligence before the termination of the relationship." 889 P.2d at 147; *see Economy Housing Co., Inc. v. Rosenberg*, 239 Neb. 267, 475 N.W.2d 899 (1991).[9] As the *Morrison* court recognized, however, "this runs counter to the rationale for the rule ..." designed to permit a "client to work with the attorney to correct the error even though the client knows the error exists." 889 P.2d at 147. The court also noted as follows:

> A synthesis of cases dealing with the continuous representation rule reveals that its purpose is to benefit both the client and attorney by allowing the attorney to attempt to correct or mitigate damages caused by the attorney's error and allowing the client to refrain from discharging the attorney upon discovery of the error.

*Id.* at 148.

■ In *O'Neill v. Tichy*, 19 Cal.App.4th 114, 25 Cal.Rptr.2d 162 (1993), the court held that, under California's statutory codification of the continuous representation rule, a "client's awareness of the attorney's negligence does not interrupt the tolling of the limitations period so long as the client permits the attorney to continue representing the client regarding the specific subject matter in which the alleged negligence occurred." 25 Cal.Rptr. at 165. Likewise, we hold that the client's actual or constructive knowledge of the attorney's allegedly negligent act does not prevent application of the continuous representation doctrine.

## C. Conclusions

■ We conclude that the continuous representation doctrine is an appropriate mechanism for altering the effect of the statute of limitations where the attorney and client continue their relationship, with respect to the specific matter underlying the alleged malpractice, beyond the time of that alleged malpractice. As in *Muller* and courts of other jurisdictions, we specify that

---

**9.** The slight confusion regarding this aspect of the doctrine is demonstrated by dicta from *Sharp v. Teague*, 113 N.C.App. 589, 439 S.E.2d 792 (1994). In that case, the court held that it remained an "open question in North Carolina as to whether we recognize the 'continuous representation' doctrine." *Id.* at 795. However, in attempting to characterize the ramifications of application, the court summarized that doctrine by saying that "the statute of limitations and the statute of repose do not accrue until the earlier of either the date the attorney ceases serving the client in a professional capacity with regard to the matters which are the basis of the malpractice action or the date the client becomes aware or should become aware of the negligent act." *Id.* From a review of the typical applications of the doctrine, it does not appear that this summary is an appropriate statement of the rule.

the doctrine is to be utilized only where the attorney's "involvement after the alleged malpractice is for the performance of the same or related services and is not merely continuity of a general professional relationship." *Muller,* 437 N.Y.S.2d at 207. We strongly emphasize the necessity of examining the nature of the continuing representation. The continuous representation doctrine applies only to malpractice actions in which there is clear indicia of an ongoing, continuous, developing, and dependent relationship between the client and the attorney. The doctrine should only be utilized only where the attorney's involvement after the alleged malpractice is for the performance of the same or related services and is not merely continuity of a general professional relationship. We further impose the restriction that the burden of establishing the elements necessary for the application of the doctrine is upon the client.

Based upon the foregoing, we reverse the decision of the lower court granting summary judgment to the Appellee, and we remand this matter for further proceedings consistent with this opinion.

Reversed and Remanded.