[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
In this case, the plaintiff has filed suit for damages arising out of the alleged legal malpractice of a deceased attorney. The initial complaint named the "Estate of A.A. Washton," and two lawyers formerly associated with Attorney Washton in the practice of law, Joseph Segal and Peter Rotella as defendants. Another judge dismissed the "Estate of A.A. Washton" as a defendant so the remaining defendants are Segal and Rotella. In their behalf, counsel has filed a motion for summary judgment which is based on the following grounds:
1. The plaintiff's Revised Complaint dated July 5, 2002, despite allegations purporting to sound in breach of contract, is, in fact, a legal malpractice action grounded in tort and is thereby governed by and precluded by the applicable tort statute of limitations, Connecticut General Statutes § 52-577.
2. The Twentieth and Twenty-First Counts (the "CUTPA" counts) are barred by the time limitation set forth in Connecticut General Statutes § 42-110g (f).
3. The Seventeenth and Eighteenth Counts (the fraud counts) and the Fourteenth and Fifteenth Counts (breach of implied covenant counts) fail to state a cause of action and/or are barred by the applicable statute of limitations.
4. The Eleventh and Twelfth Counts (dealing with the alleged mishandling of a mortgage foreclosure) are also barred since the plaintiff had no ownership interest in the subject premises and therefore could not have sustained damage as a matter of law.
5. The plaintiff may not establish the terms of an alleged oral contract or the breach thereof through the use of inadmissible evidence. CT Page 3367
6. Allegations pertaining to the alleged breach of a simple or oral contract are barred by the applicable statute of limitations Connecticut General Statutes § 52-581.
7. The defendants Joseph F. Segal and Peter W. Rotella were not partners of the late A.A. Washton and may not be held liable for his alleged legal malpractice.
The court will attempt to discuss each one of the foregoing issues raised in the defendants' motion for summary judgment. The standards to be applied in deciding a motion for summary judgment are well known. A court should not grant such a motion if a genuine issue of material fact is raised because to do so would deprive a litigant of his or her constitutional right to a jury trial. On the other hand, if there is no such issue and the matter can be decided as a question of law, the motion should be granted to avoid imposing on litigants the expense and upset brought about by continuing court proceedings. It is fair to say that many of the issues raised by this motion do not involve disputed questions as to facts but rather concern conflicting legal claims.
The court will first discuss the issues surrounding the breach of contract claim against the defendants. Most of the issues raised concern claims made under the statute of limitations. But there are also other issues not directly involving the limitations statute but questioning whether the contractual claims can be evidentially proven and also whether the plaintiff can make such a claim regarding the foreclosure of property said to be in his ex-wife's name. The court will then discuss the motion as it applies to the CUTPA claim and the claim in common law fraud.
 A.
Claim in Contract or Claim in Tort
(1.)
The defendants claim the plaintiff's complaint is barred by the statute of limitations governing tort claims.
As the defendants point out, "Summary judgment may be granted where the claim is barred by the statute of limitations," Doty v. Mucci,238 Conn. 800, 806 (1995), as long as the "material facts concerning the statute of limitations are not in dispute," Burns v. Hartford Hospital,192 Conn. 451, 452 (1984). Insofar as a legal malpractice action is regarded as a tort, it is governed by the general tort statute, § CT Page 336852-577, which provides that no tort action "shall be brought but within three years from the act or omission complained of." This statute has been defined as an "occurrence statute" which means "that the time period within which a plaintiff must commence an action begins to run at the moment the act or omission complained of occurs." Collum v. Chapin,40 Conn. App. 449, 451 (1996). Thus, in a legal malpractice claim, which is construed as a tort, the controlling date for accrual purposes is likewise the date of the act or omission complained of as opposed to the date of any consequences caused by the act or omission, Shuster v.Buckley, 5 Conn. App. 473, 477-79 (1985).
The defendants point out that the alleged tortious conduct in the complaint occurred on various dates between 1990 and 1994; the latter date is the date on which Attorney Washton died and the wrongdoing, according to the defendants, was committed by him. But the initial complaint was served on the defendants in August of 2002, well beyond the ambit of § 52-577. Thus, if this action is based on tort, the motion should be granted. The defendants nicely frame the issue for the court by their saying: "However, the plaintiff seeks to circumvent the applicable statute of limitations by characterizing his claims as a breach of contract claim instead of appropriately labeling his claim as a legal malpractice action."
But, as will be discussed shortly, cases have indicated that a legal malpractice claim can be brought in contract or tort cases where contract action permitted, Camposano v. Claiborn, 2 Conn. Cir. 135, 137 (1963);Stowe v. Smith, 184 Conn. 194, 199 (1981) (claim can be brought in contract or tort); cf. Robbins v. McGuinness, 178 Conn. 258, 261 (1979), and Westport Bank Trust v. Corcoran, Mallin Aresco,221 Conn. 490, 494 (1992); see also Mac's Car City, Inc. v. DeNigris,18 Conn. App. 525, 530 (1989). Also see medical malpractice cases, Hickeyv. Slattery, 103 Conn. 716, 719 (1926) (negligence cause of action barred by limitations statute, implied contract claim not barred); cf. Brice v.St. Joseph's Hospital, 153 Conn. 626, 628 (1966).
Our state has not held that in legal or medical malpractice a contract claim can be asserted only if there is an explicit agreement to achieve a specific result. Our court has really only set the following limitation on the use of both theories when one delict (fault causing activity) is involved:
Some complaints state a cause of action in both contract and tort . . . When rules governing contract actions conflict with those governing tort actions courts sometimes characterize an action as either contract or tort and choose the applicable rule accordingly . . . Unless a CT Page 3369 particular conflict between the rules of contract and tort requires otherwise, a plaintiff may choose to proceed in contract, tort or both . . .
Stowe v. Smith, 184 Conn. 194, 199 (1981) (legal malpractice suit). Judge Hodgson makes this point also in Fontanella v. Chrysler Corp. ,16 Conn.L.Rpt. 489 (1990), citing, as Stowe does, Watrous v. Sinoway,135 Conn. 425, 426 (1949).
All of this is very nice, but the question remains, when faced with a statute of limitations claim, how do you decide whether a claim "really" lies in tort or contract — the latter theory providing usually for the possibility of a longer limitations period. In Legal Malpractice, Mallen Smith, 5th Ed. (2000), Vol. 3, § 22.3, pp. 315-16, the following is said:
The hybrid nature of a cause of action for legal malpractice means that the action may sound in either tort, in contract or in both. The jurisdictions take a variety of approaches in determining the applicable statute of limitations. The prevailing method is to determine the "essence,"substance," or "real nature" of the claim, no matter how labeled or alleged. There is jurisdictional variation of the criteria emphasized.
Our appellate courts seem to use this approach when faced with statute of limitations issues in malpractice cases where the plaintiff seeks to have the suit survive by couching the claim in contract theory. See, for example, Rumbin v. Baez, 52 Conn. App. 487, 491-92 (1999); DiMaggio v.Makeover, 13 Conn. App. 321, 323 (1988); Shuster v. Buckley,5 Conn. App. 473, 478 (1985); Barnes v. Schlein, 192 Conn. 732, 735-36
(1984). Such an approach is not confined to legal and medical malpractice claims. See Bonan v. Goldring Home Inspections, Inc., 68 Conn. App. 862,868 et seq. (2002); cf. Gazo v. City of Stamford, 255 Conn. 245, 262 et seq. (2001).
Purporting to use this approach, the defendants argue that a careful reading of the complaint reveals that its essence lies in tort, not contract, and thus the tort statute of limitations applies. At pages 12 to 14 of the brief, it is argued that:
". . . the only agreement alleged by Sutera to buttress his breach of contract claim is an unwritten retainer agreement." (See proposed Revised Complaint, dated July 5, 2002, First Count para. 4.)
The retainer agreement's terms are purportedly defined in para. 6 where CT Page 3370 Sutera claims Washton "explicitly or implicitly agreed to represent the plaintiff in said matters in a competent manner and had an ethical obligation to provide competent representation to a client." The only additional agreement alleged by Sutera is found in para. 15 where Sutera claims that within one week of the sentencing he asked Washton "to appeal the aforesaid sentence to the Court of Appeals, which A.A. Washton agreed to do but never did." Para. 23 of the First Count lists all the alleged breaches of contract and they are merely boilerplate specifications of negligence of the kind used in legal malpractice actions. The Supreme Court in Barnes stated that "[a] fair reading of the complaint [in theBarnes case] reveals that the gravamen of the suit was the alleged failure by the defendant to exercise the requisite standard of care. Her complaint is absolutely barren of any allegation that the defendant breached any contractual agreement made with her." Barnes at 735-36. Similarly, the complaint in this case is limited to alleged failures by the defendant to exercise the requisite standard of care. Except for the single allegation regarding the alleged failure to take an appeal after the sentencing hearing, there are no allegations alleging the breach of a contractual agreement. Sutera's allegations are limited to questioning the competency with which Washton handled the subject matter of the representation agreement but not that Washton failed to represent Sutera at all or that he failed to fulfill an express warranty.
The defendants, applying what might be called then the "real essence test," argue that the claim here lies in tort with its shorter statute of limitations. Gazo is referred to where the court said: "Putting a contract tag on a tort claim will not change its essential character . . . It is clear that the gravamen of the plaintiff's third-party beneficiary contract theory is in reality a tort arising out of a contract." 255 Conn. at page 263.
What makes this test difficult, at least for this trial court, is that it leaves aside a large body of contract law in this and other jurisdictions which seem to recognize a contract action for failure to comply with an industry, professional, or trade standard of care. So the question becomes how is this law to be treated, should it be viewed differently in the context of legal or medical malpractice or more to the point when statute of limitation issues are involved?
In other words, in the most general reference work available at 17A Am.Jur.2d § 627, in the article on "Contracts," it states that:
A contracting party may be bound by the terms of the contract to perform it in a good and workmanlike manner. Moreover, as a general rule, there is implied in every contract for work or services a duty to perform CT Page 3371 it skillfully, carefully, diligently, and in a workmanlike manner.
Failure to comply with this implied duty to perform in a skillful and workmanlike manner may not only defeat recovery but may entitle the other party to damages resulting from the unskillful and unworkmanlike performance . . . With respect to the skill required of a person who is to render services, it is a well-settled rule that the standard of comparison or test of efficiency is that degree of skill, efficiency and knowledge which is possessed by those of ordinary skill, competency and standing in the particular trade or business for which he (she) is employed.
Cf. Graulich v. Frederic H. Berlowe Associates, Inc.,338 So.2d 1109, 1110 (Fla., 1976) (third-party complaint against architects); also see New Trends, Inc. v. Stafford-Loudon Co.,537 S.W.2d 778, 782 (Tex., 1976).
Also see 7 Am.Jur., Pleading and Practice Forms, Form 55 at p. 254, where a model form is given.
Section 55 Instruction to jury — substantial performance — good and workmanlike manner.
You are instructed that where a contract specifies that (nature of work) is to be done in a "good and workmanlike manner," it means that the work is to be done in the way in which a conscientious workman (sic) of average skill and intelligence would do it (as noted such a condition is implied in any contract for work or services).
All of the above sounds suspiciously like the standard of care instructions and considerations in a malpractice action based on negligence. Are we to forget or ignore ordinary contract law when faced with a statute of limitations problem? Or more confusing to the symmetry of contract law, are we to take into account the above considerations when they are raised as a defense to a contract action by the worker or professional performing services who brings suit but say that when such standards are relied upon by the service provider in a contract claim conclude such reliance only proves that a contract claim should not be allowed because it is really a tort? Or should we say this would be true only if there is a statute of limitations issue intertwined with question?
At the risk of being repetitive, it is necessary to focus the problem by referring to the language of an older case. As previously suggested, Connecticut does not depart from the general view that a contract theory CT Page 3372 can be advanced for alleged breach of an explicit or implied promise to perform a certain service in a competent manner. In a case that has not been overruled, Hickey v. Slattery, 103 Conn. 716 (1926), a contract theory of recovery was allowed. The court said:
The plaintiff is suing the defendant, a surgeon, for pain, suffering, incapacity, expenditures and losses which he alleges to be due for the failure of the defendant properly to set and treat his broken arm. The complaint is in two counts, the first relying upon the implied obligation of the defendant, arising out of his employment, to use proper skill and care, and the second resting upon the alleged negligence of the defendant in the way in which he set and cared for the arm. Undoubtedly, in such a case, the plaintiff may lay his action either in contract or tort, pp. 718-19.
See also Mac's Car City, Inc. v. DeNigris, 18 Conn. App. 525, 529-30
(1989); Bria v. St. Joseph Hospital, 153 Conn. 626, 630-31 (1966).
How should we work our way out of what Mallen describes as the morass presented by the fact that at one time or another our jurisdiction, as well as others, have suggested a tort or contract theory would lie in this area — and do it in such a way as to preserve the integrity of contract law and malpractice theory?
One way of deciding whether a complaint sounds in contract or tort and ensuring that a claim that is really for negligence does not have a contract label attached to it to avoid the operation of the limitations statute is to examine what recovery, that is, damages is being sought. IfGazo is read closely, that is the real thrust of the opinion; see discussion at 255 Conn. pp. 263, et seq. The court initiates the discussion of whether in the case before it the claim was really in tort rather than contract by saying it was "an appropriate case in which to pierce the pleading veil . . . we look beyond the language used in the complaint to determine what the plaintiff really seeks," id. pp. 262-63, (see also Bonan v. Goldring Home Inspections, Inc., 68 Conn. App. 862,868-69 (2002), for use of this approach in deciding trial court did not err in declining to instruct on contract count since contract damage claim was exactly same claim as that in negligence count and instructing on both theories would have led to a double recovery).
How should this test be applied in a case where a statute of limitations issue is presented and the goal is to recognize the continued viability of breach of contract and negligence claims arising out of the same wrongful activity but prevent use of a contract label to avoid the rightful operation of the limitations statutes? A case decided by the New CT Page 3373 York Court of Appeals offers what to this court is a helpful solution. InSantulli v. Englert Reilly, 579 N.Y.S.2d 324 (1992), the court ultimately decided that the legal malpractice claim before it was governed by New York's six-year contract statute of limitations rather than the three-year tort limitation period. On the way to that result, the court said, "A cause of action for breach of contract may be based on an implied promise to exercise due care in performing the services required by the contract" and also concluded, in agreement with Connecticut law that "an express to obtain a specific result is (not) required to sustain a contract cause of action in the context of an attorney-client relationship," Id. pp. 326-27.
Turning to the issue before it the court chose not to subvert this basic contract law and thus focused on the fact that it was deciding a limitations question. At page 327, the court said:
We have been called upon on prior occasions to respond to the question of the appropriate statute of limitations to be applied in actions for professional malpractice . . . and concluded that the choice of applicable statute of limitations is properly related to the remedy rather than to the theory of liability.
Repeating this language, the court went on to say that the: "Language used in many of our earlier cases indicated, however, that in applying the statute of limitations, the `reality' or `essence' of the action should be examined." Id. p. 328. But the court went on to say: "No persuasive reason is offered, however, for not applying the six-year statute of limitations (contract) to a legal malpractice claim where the remedy sought is damages relating solely to the plaintiff's pecuniary or property loss and which arose out of the contractual relationship." Id., p. 328.
Thus, in New York, the solution is as follows:
Where a plaintiff fails to commence an action to recover damages on a legal malpractice claim within three years of the accrual of the cause of action (tort limitation), and seeks to rely on the six-year contract statute of limitations to protect the claim, the damages recoverable will be limited to those damages recoverable for the breach of contract. To the extent the legal malpractice claim seeks damages different from or greater than those customarily recoverable under a breach of contract claim, (PLR 214(6) (tort limitations statute) will govern.
Id. pp. 328-29.[1]
CT Page 3374
Relying on all the foregoing general considerations, can it be said in this case that as to the numerous breach of contract counts a true breach of contract claim is involved or is the "real essence" of each of the counts a claim in negligence with a contract label adopted merely to avoid the operation of the tort limitation statute? The breach of contract claims are made as to various matters (1) representation in a criminal case; (2) representation in a family matter; (3) representation in a foreclosure case; (4) representation in bankruptcy court concerning the proceeds from a lottery ticket, and a breach of contract apparently based on the nature of the retainer agreement. The various counts advancing the contract claims incorporate by reference the first twenty-two paragraphs of the first count.
Looking at these paragraphs and giving them every favorable inference, they set forth the plaintiff's legal problems and make clear that in relation to them, he was in the market for a lawyer (offer). Paragraph 6 says that:
(6). At all relevant times A.A. Washton and the Law Offices of Washton, Segal and Rotella explicitly and/or implicitly agreed to represent the plaintiff in said matters (referring to legal problems mentioned above) in a competent manner . . . (acceptance).
The remainder of the paragraphs in the first count go on to allege the manner in which Attorney Washton went about providing legal services. The same pattern is followed in the other counts and their various claims and a similar approach is taken in the claims against the defendants Segal and Rotella. As to each legal problem for which the plaintiff sought representation the respective counts then set forth how, in light of the agreement to provide competent representation, the defendants failed to provide that representation. Beyond the complaint an affidavit has been provided by Mr. Sutera in which he alleges certain specific promises were made to him by Washton relative to these matters that a criminal appeal would be filed, that he would keep a large share of his lottery winnings, that his alimony would be reduced to one dollar per year, that he would not lose his house. It is unclear whether these representations were made at the alleged time of contract formation. In any event, the plaintiff relies on a duty of competent representation in all the various matters in which he retained Attorney Washton.
The question then becomes do we have viable contract claims here and, if so, what type of contract is involved in these claims? The court has previously discussed contract formation in the context of malpractice and agreements to provide a service. Focusing on the specific facts of this case, a comment in Law of Contracts, 4th ed., Calamari and Palmieri is CT Page 3375 helpful in defining the legal relationship created between Sutera and Washton. At § 1.11, p. 21, it says:
When the parties manifest their agreement by words the contract is said to be express. When it is manifested by conduct it is said to be implied in fact. If A telephones a plumber to come to A's house to fix a broken pipe, it may be inferred that A has agreed to pay the plumber a reasonable fee for the plumber's services although nothing is said of this. The contract is partly express and partly implied in fact. There are cases of contracts wholly implied in fact. The distinction between this kind of contract and a contract expressed in words is unimportant: both are true contracts formed by a mutual manifestation of assent.
If the plumber did not do the work he or she was hired to do in a competent manner and the pipe that was worked on burst again and flooded the basement, it could hardly be argued that a breach of contract claim could not lie for the incompetent manner in which the work was done under the contract merely because a negligence claim could also be brought for the damages caused by the same incompetence. Why is it necessary then to ignore or redefine basic contract law just because a limitations issue is presented? Or to put it another way, let us say that in the same factual scenario a negligence theory is advanced but in the particular jurisdiction where the action is brought the limitations period for negligence is longer than that for contract actions; let us further suppose the defendant raises a limitations defense — could it then be argued the action is barred because we really have a contract claim here masquerading as a negligence theory of liability?
The integrity of negligence and contract law and the liberal policy of alternative pleading can be preserved while still accommodating the policies behind limitations statutes if, in a case like the one before the court, a contract action is permitted where rudimentary requirements are met — offer acceptance, failure to perform in a manner explicitly bargained for or implied in a work of the type bargained for but, as the New York Court of Appeals suggested, recovery in the contract action would not be allowed for damages not typically permitted in contract actions.
Thus, if in a particular case, all of the damage claims would not be recoverable in contract but really represent tort damage claims then, despite the contract label and language of contract breach, the tort limitations statute would bar the action. But if some but not other damage claims would be permitted under contract law those claims could be litigated despite the bar of the tort limitations statute but tort claims for damages that are also made under the contract theory would in any CT Page 3376 event be barred by an application of contract law.
In the various breach of contract claims set forth in this complaint, there are several that ordinarily would not be allowed under a breach of contract theory. Thus, there are claims for "mental anguish and stress of mind," for loss of reputation and the fact that because of the breach the plaintiff will not be allowed to enjoy "the full spectrum of life's activities." It is generally true that recovery for mental anguish is not allowed in actions for breach of contract. Cf. Bertozzi v. McCarthy,164 Conn. 463, 469 (1973), cf. Restatement 2d Contracts, § 353, also see § 48 of 22 Am.Jur.2d, "Contracts" at p. 70. The same is true for loss of reputation arising out of a breach of contract, cf. DanberConstruction Corp. v. Staten Island Mall, 392 N.Y.S.2d 299 (1977); see p. 72 of § 48 of Am.Jur. article. To allow such damage claims "would extend contract obligations far beyond reasonable expectations." Gazo v.City of Stamford, 255 Conn. at p. 267.
But the court cannot unequivocally say that other damage claims made by the plaintiff under each of the breach of contract claims are not consequential damages that therefore they would not be recoverable under a contract claim. Certainly consequential damage claims are permitted in contract actions but, as noted, they do not ordinarily include claims for pain and suffering and loss of reputation. Consequential damages have been defined as "special damages (that) result from the natural consequences of the act complained of . . ." Waterbury Petroleum Products, Inc. v.Canaan Oil Fuel Co., 193 Conn. 208, 223, n. 16 (1984); cf §42a-2-715 of the commercial code. In other words, contract price is not the only determinant of damages in contract damage claims. Thus, in § 347 of Restatement 2d Contracts sets forth the general rule for the measure of damages in contract actions. In comment c "other loss" is defined. Therein it says under contract theory "the injured party is entitled to recover for all losses actually suffered. Items of loss other than loss in value of the other party's performance are often characterized as incidental or consequential. Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction."[2]
In this case, the breach of contract claims state damage claims which are arguably consequential damages. There are claims for attorneys fees incurred to rectify allegedly inadequate criminal representation, deprivation of a sizeable sum in lottery payments in the breach of contract claim involving the bankruptcy matter, assessment for arrearage on alimony in breach concerning representation in family case, loss of property value as result of breach in foreclosure matter, retainer CT Page 3377 agreement claim and allegation that plaintiff cannot now ascertain if his funds were improperly withheld.
Based on the foregoing, the court cannot say that there is no viable contract claim in this case merely because certain or most aspects even of the damage claims made as to each breach of contract claim sound in tort and ordinarily would not be allowable.[3]
In any event, the court will not adopt the defendants' position that the revised complaint although "purporting to sound in breach of contract," is really "a legal malpractice action grounded in tort" and thus governed by the tort limitations statute (§ 52-577). There, in fact, are contract claims that can be made although the ambit of those claims as far as damages are concerned may be severely limited. The court, having adopted this position, however, cannot grant summary judgment based on the application of § 52-577.
(2.)
Whether Limitations Period in Section 52-576 or Section 52-581
Applies to Any Contractual Claim
The defendants also argue that if the plaintiff is held to have a viable contract claim, it should be governed by the three-year limitation period of § 52-581 and not the six-year limitation period of § 52-576.
Under the old statutory scheme, § 6005 was the present § 52-576
and § 6010 was § 52-581. In Hitchcock v. Union New HavenTrust Co., 134 Conn. 246 (1947), the court said:
If 6005 and 6010 are to be construed to make a harmonious body of law, it is necessary to restrict the latter, as was suggested in Baker v.Lee, supra, to executory contracts. Section 6005 limits to six years actions on simple, that is, parol, contracts; 6010 limits to three years actions on contracts not reduced to or evidenced by a writing, that is, contracts resting in parol; and unless the latter is intended to apply only to executory contracts, there would be different limitations established for actions of the same type, that is, those on parol contracts, a result which the legislature could not have intended.
Id. p. 259.
The words "executed" and "executory" oral contract are used by the appellate courts as a marker to determine which limitations statute CT Page 3378 applies. Rather than get lost in abstract definitions, it is easier to examine the factual scenario which determined for the reviewing court the issue of which statute applies. Thus, in Hitchcock, right after the above quotation the court says: "The action before us is clearly one upon a simple contract where the plaintiff has fully performed, and it falls fully within 6005 (§ 52-576)." In Hitchcock, the plaintiff worker had performed overtime and had not been paid so he sued in oral contract which incorporated the provisions of the federal Fair Labor Standards Act. Obviously, the employer had not performed his part of the bargain — payment of the wages. In Cacace v. Morcaldi, 37 Conn. Sup. 735
(1981), the Appellate Session of the Superior Court held the six-year statute of limitation applied (§ 52-576) to a claim sounding in contract and based on the claimed defective construction of a chimney and a fireplace for a homeowner. The court noted in reaching its conclusion that "it is not disputed that the plaintiff fully performed his obligation to the defendant in accordance with their agreement." Id.
p. 741. The claim made was that the defendant had not performed his part of the agreement to build an operable and usable chimney. Also see Tierneyv. American Urban Corp. , 170 Conn. 243 (1976), where a real estate broker sued for his commission after procuring a rental. The court said, "When the lease was signed, `everything that was to have been done (under the alleged contract) by the plaintiff had been done, all that remained was to pay him.' Campbell v. Rockefeller, 134 Conn. at p. 587. Since the plaintiff's performance was alleged to have been completely executed, § 52-576 established the applicable limitations period." Id. p. 249 (i.e. six years). In other words, § 52-576 and its predecessor § 6005 apply where one side has performed. Also see Cupina v. Bernklau,17 Conn. App. 159, 162 et seq. (1988).
In this case, the plaintiff, in his affidavit attached to his own motion for summary judgment alleges he paid a retainer; he claims what he paid for was not done or not done according to professional standards. It would seem then that § 52-576, the six-year statute applies.
(3.)
Application of Statute of Limitations to Various Contract Claims/Continuous Representation Doctrine
The foregoing discussion only provides the predicate considerations as to whether the applicable six-year limitations statute (§ 52-576) bars any of the various breach of contract claims. As noted, the various breach of contract claims relate to the following:
(1) representation in a criminal case CT Page 3379
(2) representation in a family matter
(3) representation in bankruptcy court concerning proceeds from a lottery ticket
(4) nature of retainer agreement
Each one of the various breach of contract claims involve activities or failures to act between 1990 and 1994. Suit was commenced here on August 2, 2000. For all or some of these claims to survive requires application of the so-called continuous representation doctrine. In Rosenfield v.Rogin, Nassau, Caplan, Lassman Hirtle, 69 Conn. App. 151 (2002), the court adopted the continuous representation doctrine in a legal malpractice case involving a tort theory of recovery. It would be difficult to argue that the doctrine should not apply when the malpractice claim is brought in breach of contract. Mallen Smith give the purposes behind the acceptance of the doctrine which mirror some of the reasons given in Rosenfield at 69 Conn. App. p. 165. In Volume 3 of their work at § 22.13 p. 430, it is said that:
The summary purpose of the continuous representation rule is to avoid disrupting the attorney-client relationship unnecessarily. Adoption of the rule was a direct reaction to the illogical requirement of the occurrence rule, which compels clients to sue their attorneys though the relationship continues, and there has not been and may never be any injury. The continuous representation rule is consistent with the purpose of the statute of limitations, which is to prevent stale claims and enable the defendant to preserve evidence. When the attorney continues to represent the client in the subject matter in which the error has occurred, all such objectives are achieved and preserved. The attorney-client relationship is maintained and speculative malpractice litigation is avoided.
In malpractice actions based on contract or tort adoption of the doctrine would discourage clients from suing their lawyers prematurely because of the requirements of occurrence limitations statutes like § 52-576 or § 52-581. Worries about stale claims or lost evidence which are a central concern of limitations statutes are less significant in legal malpractice whether lying in contract or tort. As noted, inRosenfield, the subject of such actions in the tort context, but it is also true of contract claims, is "generally memorialized in court pleadings or hearing transcripts." 69 Conn. App. at p. 165. As Rosenfield
further notes in tort actions, in reasoning would apply to contract claims, adopting the doctrine "would prevent an attorney from postponing CT Page 3380 the inevitable event of defeat beyond the statute of limitations period to protect (him or herself) from liability for (his or her) actions."Id. For this latter proposition, the Rosenfield court cites the case ofSiegel v. Kranis, 288 N.Y.S.2d 831 (1968). In that case, the plaintiff brought a negligence action and a breach of contract action against a former lawyer arising out of alleged malpractice. The trial court dismissed both actions. Applying the continuous representation doctrine, the court reversed the trial court and reinstated both claims for further litigation. The plaintiff has also brought to the court's attention three cases where the doctrine was applied to legal malpractice actions based in contract. Svenska Finans Int'l BV v. Scolaro, Shulman, Cohen, Lawler Burstein, P.C., 37 F. Sup.2d 178, 182 (N.D.N.Y., 1999); Turner Boisseau, Inc. v. Nationwide Mutual Ins. Co., 944 F. Sup. 842,847 (D.Kan., 1996); Pittman, McDowell, Rice Smith, 752 P.2d 711,715, 718 (1988).
The court will now discuss each of the respective contract claims and their viability in light of the limitations statute and the continuous representation doctrine.
Mallen and Smith indicates the jurisdictions that follow the continuous representation rule vary its application but since there is only one Connecticut appellate case on the subject the court will follow what they call the "common rule" which requires: "(1) ongoing representation by the lawyer; (2) on the same subject matter; (3) that is continuous." § 22.13 at p. 431; cf. SMS Textile Mills, Inc. v. Brown, Jacobsen,Tillinghast, Lahan King, P.C., 39 Conn. App. 786, 791 (1993) (rule considered and rejected but described by court).
(a)
There is a breach of contract claim regarding the representation provided in the criminal matter. The defendants do not appear to dispute that Attorney Washton represented Mr. Sutera on the criminal case in federal court up until the time of judgment entering in that matter on August 2, 1994. Under the Federal Rules of Appellate Procedure, Washton had ten days to appeal the sentence. According to Sutera's affidavit, Washton represented his firm would file an appeal but no appeal was filed by the time the appeal expired on August 13, 1994. It is undisputed that the defendants were served in this case on August 2, 2000, within the six-year statute of limitations period of § 52-576.
It would appear that the firm of Washton, Segal and Rotella represented the defendant continuously on the same subject matter of the criminal matter up until that representation terminated which the plaintiff CT Page 3381 concedes was the date for the criminal appeal expired. As will be indicated, the court in its discussion of the fraud and CUTPA claims did conclude a question of fact was presented as to whether the apparent partnership doctrine could be relied upon which would be a necessary element of any action against these defendants as to this particular breach if the continuous representation doctrine was being relied upon. Given that conclusion and the foregoing discussion of the doctrine, the court cannot grant the summary judgment as to these defendants on the breach of contract claim relating to criminal representation provided to Sutera.
(b)
As to the breach of contract claim regarding the bankruptcy, the following facts are relevant on the limitations issue: Attorney Washton entered his appearance December 19, 1990 in the bankruptcy court and filed an answer two days later. The appearance was filed on legal paper having the firm name printed in the left margin and under Attorney Washton's signature to the answer, the firm name was printed. Attorney Segal entered his appearance on February 12, 1991, and filed a motion to withdraw on July 21, 1991, but this was never acted upon and there is no indication that a copy was sent to the client, Mr. Sutera. Sutera claims the defendants participated in meetings regarding this matter and claims notice of hearings in the case were sent to him by the firm. The date of the meetings or when the notices were sent in relation to the entry of the appearances is not indicated. The revised complaint indicates that in 1990 Sutera won a substantial sum from the Massachusetts lottery and Sutera, in his affidavit, stated that Attorney Washton promised that he would keep a substantial portion of his lottery winnings and that he and the firm would challenge all creditor claims filed in bankruptcy court to this fund. On July 25, 1994, the bankruptcy trustee moved for authority to sell this property of the estate. On August 1, 1994, the bankruptcy court set a hearing date of August 30, 1994 for a hearing on the trustee's motion to sell the lottery ticket. On August 9, 1994, Attorney Washton filed an objection to the trustee's request but never appeared at the August 30th hearing. The plaintiff's expert Lobo testified at her deposition that Washton filed an objection to the sale of the lottery ticket, but did not appear at the hearing, the complaint was referenced during her questioning and she appeared familiar with the bankruptcy court file. A copy of the transcript from the bankruptcy court indicates per court order objections to the sale of the lottery ticket were to be filed by August 26, 1994, but the trustee represented none had been filed. None of the specific allegations of the complaint just referred to regarding the July 25 and August 1, 1994 notices from the court are otherwise established through documents or affidavits. The same is true CT Page 3382 as to the purported filing of objections to the sale on August 9, 1994, which is also referenced in the complaint.
It is also interesting to note that in an October 1994 letter from Sutera to Segal, Sutera referenced the fact that he had had many conversations with Attorney Washton to the effect that many of the claims in the bankruptcy case were incorrect. This letter was submitted in opposition to the summary judgment motion.
It is difficult for the court to decide this issue based on the record submitted. A New York case cited in Mallen Smith states the following concerning the continuous representation doctrine:
For the doctrine to apply, there must be "clear indicia of an ongoing, continuous, developing and dependent relationship between the client and the attorney often involving an attempt by the attorney to rectify an alleged act of malpractice . . ." One of the predicates to application of the continuous representation doctrine is continuing trust and confidence . . . In this case, any such relationship the parties had ceased to exist `several years' after the initial retention when the plaintiffs demanded their documents and a return of their retainer fee. There is a significant lapse in representation in this case well exceeding the applicable statute of limitations period, and the representation cannot be said to be continuous under these circumstances . . .
Pitelli, et al v. Schulman, 512 N.Y.S.2d 860, 861-62 (1987).
Based on the facts just mentioned, the court cannot definitively conclude there was a "lapse of representation" here after the filing of the appearances if Sutera's affidavit, the letter to Attorney Segal and some of Attorney Lobo's testimony as to Washton's continued involvement in the bankruptcy matter at least until August 9, 1994 is given every favorable inference. Nor is there any implied or explicit evidence of antagonism between Sutera and the firm or an expressed desire by him to terminate the relationship prior to the critical dates of August 9 or 30 of 1994. Cf. cases like Aaron v. Roemer, Wallans Millneaux,707 N.Y.S.2d 711, 714 (2000).[4]
Suit was filed in this case on August 2, 1990, so if the apparent partnership doctrine is applied, then there is a material issue of fact presented over whether there was continuous representation through August of 1994 so as to bar application of the limitations statute in the actions against Rotella and Segal. Attorney Segal entered an appearance in the bankruptcy matter which apparently remained in the file until the bankruptcy matter was concluded in 1997. As to the firm and its purported CT Page 3383 partners and as to Segal individually, the rule under the continuous representation doctrine is that: "Ordinarily, an attorney's representation is not complete until the agreed tasks or events have occurred . . ." 22.13, p. 441 of Law of Malpractice, Mallen and Smith, Vol. 3, p. 441; also see Maddox, et al v. Burlingame, 517 N.W.2d 816, 818
(Mich., 1994); Chapman v. Sullivan, 411 N.W.2d 754, 755 (Mich., 1987);Panattoni, et al v. Superior Court, 250 Cal.Rptr. 390, 392 (1988); cf.Worthington v. Ruconi, 35 Cal.Rptr.2d 169, 174 (1994).
The court cannot conclude that the contract claim regarding the bankruptcy matter is barred by the limitations statute at least on the basis of the record presented.[5]
(c)
The application of the continuous representation doctrine to the alimony matter is, to the court at least, an even more difficult question. In the divorce case, Sutera represented himself and he was ordered to pay $500 a week alimony to March 2000. At some point, he retained Washton and the firm according to his affidavit. Appearances were filed by Segal and Washton in November 1990. There is some indication from the plaintiff's expert that a motion to modify the alimony was filed but not pursued. In his affidavit, Sutera also states he talked with Washton and the defendants about the alimony matter, but gives no dates for these purported discussions. In December 1992, Mr. Sutera became paralyzed, he states that Attorney Washton told him he would get the alimony reduced to $1 per year. In his affidavit, Sutera also represents that notices of hearings in his alimony case were sent to him and signed with the firm name. This, along with Washton's representation, indicate that all of this occurred before Washton's death.
The plaintiff's expert testified failure to file a motion to modify as a result of the disability breached a lawyer's duty to represent a client with reasonable skill. Sutera's subsequent incarceration also created an obligation on an attorney representing Sutera to file a motion to modify. At some unspecified time, the ex-wife filed a proof of claim in the bankruptcy court regarding Sutera's alimony obligation so that the obligation to modify the alimony award was part of the bankruptcy case and that case continued until 1997.
Even as compared with the bankruptcy scenario, the problem with this factual setting is that there is little to indicate any ongoing discussion between client and lawyer or steps taken by the lawyer regarding alimony modification after December 1992, when Mr. Sutera CT Page 3384 suffered his paralysis and Washton represented he would have his alimony reduced. But the fact remains that Sutera retained Washton to modify his alimony, and if Sutera is to be believed, Washton indicated he would do so — that was the agreement between them and the task Washton was hired to perform. On the other hand, as has been noted, it is true that the general language in some of the cases suggest the continuing representation doctrine there must be an "ongoing, continuous, and developing and dependent relationship between the client and the attorney." Keegan v. First Bank of Sioux Falls, 519 N.W.2d 607, 614
(S.D., 1994). This would appear to conflict with the broad statement in Mallen quoted in the previous section to the effect that "an attorney's representation is not complete until the agreed tasks or events have occurred . . ." In other words, what if an attorney is retained to accomplish a task, little or no contact occurs then between the client and lawyer for years, the task is not accomplished and the client wishes to sue in malpractice long after the limitations statute would ordinarily have run? Pittelli, et al v. Schulman, 512 N.Y.S.2d 860 (1987), provides an interesting insight on the tension between the two aspects of the doctrine. In that case, the attorney was hired in 1962 to arrange for the adoption of a child but an order for adoption was not signed until 1985. In June 1985, the plaintiffs sued for legal malpractice based on the delay of more than 22 years in finalizing the adoption. The court sustained the defendant lawyer's summary judgment motion based on New York's limitations statute and rejected the application of the continuous representation doctrine to save the suit. The court said at 512 N.Y.S.2d, pp. 861-62, "For the doctrine to apply there must be a `clear indicia of an ongoing, continuous developing and dependent relationship between the client and the attorney, often involving an attempt by the attorney to rectify an alleged act of malpractice . . .' One of the predicates to application of the continuous representation doctrine is continuing trust and confidence . . . In this case, any such relationship the parties had, ceased to exist (several years after the initial retention when the plaintiffs demanded their documents and a return of the retainer fee). There is a significant lapse of representation in this case well exceeding the applicable statute of limitations." In Pitelli, the court appeared willing to apply the doctrine even though several years had passed since the date of hiring with apparently no client contract and only concluded the relationship was ended when the clients wanted documents and the fee back — the lapse of time consideration ran only from that point. Any other result would present the odd situation where a lawyer promises and is retained to do something, say bring suit, has no contact with the clients for years, but can defend against the suit by relying on the limitations statute and saying the continuous representation doctrine cannot apply because there was no ongoing relationship. As the court said in Wilson v. Econom, CT Page 3385288 N.Y.S.2d 381, 383-84 (1968), ". . . clients rarely consult other attorneys while their case is pending. In the case of such malpractice, there is no reason for the client to suspect that anything is wrong and the statute could actually run out while the attorney is still holding on to the papers and the case. Unless this exception (continuous representation doctrine) were to be recognized in the case of lawyers' malpractice, a lawyer who had committed an act of malpractice could render himself immune from liability by the simple device of holding onto the file for three more years." (Referring to New York limitations statute.)[6]
For all of the foregoing reasons, the court concludes that, at least on the state of the record before it, the continuous representation doctrine would apply to bar application of the limitations statute.
(d)
As to the foreclosure matter, the court reaches the same result based on the foregoing analysis. Sutera in his affidavit says that he retained the firm to represent him on the foreclosure matter and he discussed this matter with Washton and the defendants. He states that Washton promised him the firm would represent him on this matter and he would not lose his house. In the October 1994 letter to Attorney Segal, there is a suggestion that he had talked to Washton about matters involved in the foreclosure action at some point before the actual letter was sent. The court concludes at this junction that the continuous representation doctrine applies, or at least cannot conclude, based on what has been presented to it, that it is not applicable.
(e)
There are two counts directed against each of the defendants claiming a breach of contract because Sutera was never provided with a fee arrangement, whether hourly or flat, never provided with an accounting of how his retainers were being used and never provided with a bill indicating the fee arrangement. Neither side briefed this claim from the perspective of the continuous representation doctrine and the limitations defense so the court will not rule on the viability of these counts.
(4.)
Mishandling of Foreclosure Matter
Apart from the statute of limitations issue, the defendants also specifically allude to the eleventh and twelfth counts of the Revised CT Page 3386 Complaint dealing with a breach of contract claim based on the alleged mishandling of a mortgage foreclosure. It is argued that these counts should be dismissed "since the plaintiff had no ownership interest in the subject premises and therefore could not have sustained damage as a matter of law." The defendants rely on page 28 of a deposition of Mr. Sutera where the following occurred.
Q — With respect to the foreclosure action on the 59 Twin Lakes property when did you first talk about Attorney Washton assisting you with that?
A — (Sutera) When my ex-wife filed bankruptcy and understood that I was allowed to keep the house. But since the house was in my ex-wife's name, she agreed to keep the beach house and she would sign over that house on Twin Lakes Drive to me.
However, the plaintiff retained an expert, Attorney Lobo, who, during the course of her deposition, made the following representations which further explained what Mr. Sutera meant and which have not been contradicted by anything submitted by the defendants:
A — May I see the domestic file? First of all, Mr. Sutera was obligated on those debts, and I believe — the divorce judgment provided that this Twin Lakes property was to be quitclaimed to the wife, and after certain obligations were fulfilled, it would actually be quitclaimed back to Mr. Sutera. So I guess he had an equitable interest in the property as far as that he was going to receive the property back if those events happened.
But also he was obligated on the mortgages and other — there was a first mortgage, a second mortgage, then there was another mortgage and an attachment, all to New England Savings Bank at the time. And there were also judgment liens and the like on the property.
Q — So I'm asking you what would the attorney's contractual obligations to Joseph Sutera be with respect to this foreclosure action?
A — To defend the foreclosure.
The plaintiff would seem to have an equitable interest in the property which would entitle him to bring a suit for damages.[7]
(5.)
Proof of the Oral Contract Claims CT Page 3387
Even if the court were to construe several of the counts to lie in contract and not the tort of legal malpractice, the defendants argue there is a fatal flaw in the plaintiff's contract claims Sutera will not be able to prove them by admissible evidence. Attorney Washton is deceased and to establish the contract claim, the plaintiff will have to rely on Washton's out-of-court statements. Thus, they would clearly be hearsay and inadmissible under the code of evidence (see §§ 8-1 and8-2).
It is true that we have a so-called "Dead Man's Statute" (sic), §52-172, but the plaintiff argues it does not apply to this case. As noted in Tait's Handbook of Connecticut Evidence, 3d ed. at § 8.47.4, by its terms "the statute applies only to suits by or against `representatives of deceased persons.' Included within this term are (1) personal representatives, such as executors and administrators, and (2) legal representatives, such as devisees, legatees, distributees and purchasers by will. Baxton v. Camp, 71 Conn. 245, 252 . . . (1898); Pixleyv. Eddy, 56 Conn. 336, 338-40 . . . (1888)." The estate of Washton is no longer a party to this litigation and clearly neither defendant falls within the definition of a "representative" as defined in the statute.
But there is another aspect to this problem, which was not directly addressed by counsel. The court has concluded that it is question of material fact in this case whether the doctrine of partnership by estoppel or apparent partnership should apply.[8] At common law, it was held that . . ."a partner is both principal and agent, principal as to himself (or herself) and agent as to other partners." Hotchkiss v.DeVita, 103 Conn. 446, 447-48 (1925). Also see Prisco v. WestgateEntertainment, Inc., 799 F. Sup. 266, 270 (D.Conn., 1992), where the court said: ". . . it is basic partnership law that every partner is an agent of the partnership and that the knowledge of a partner regarding partnership affairs is imputed to all other partners. See Connecticut General Statutes §§ 34-47, 34-50." The statutes have been repealed since Prisco, but the basic common law principle still holds true.
If an apparent partnership does exit, then it would seem appropriate to also conclude that any of the purported partners would be bound by the statements of persons held out to be their partners and thus agents. In other words, an agency relationship can be either actual or apparent,Botticello v. Stefanovicz, 177 Conn. 22, 34 fn. 2 (1979), and it is also true that "the principal in such an agency relationship is bound by and liable for, the acts which his (her) agent does with or within the actual or apparent authority from the principal and within the scope of the agent's employment. Bank of Montreal v. Gallo, 3 Conn. App. 268, 273
CT Page 3388 (1985). But, as noted, a partner is an agent to other partners and if people involved in apparent authority relationships are bound by the acts of purported partners, why would they not be bound by what they say. To hold otherwise would make the legal and ethical requirements imposed upon partners by statute and canons of professional conduct pointless and allow individuals to escape the requirement imposed by the formal creation of such relationships.
However, the court in rejecting the defendants' argument for summary judgment on this particular issue is not intending to rule that apparent partnership has been or can be proven. Not only have the parties not addressed this particular evidentiary issue, but it is an issue which should be determined by the trial judge in the evidentiary context of the trial. Query whether, if possible, this issue should be framed in such a way that it is left to the jury to decide since the apparent partnership question is critical to the substantive claims made against the defendants. That is, if evidence as to apparent partnership meets a prima facie threshold of admissibility, any statements of Washton can be let in subject to the jury's determination of whether apparent partnership can be proven.
 B. CUTPA
The defendants argue that the claims under the Connecticut Unfair Trade Practices Act, § 42-110a et seq., are barred by the three-year limitations period set forth in § 42-110g (f) of that statute.
The basis of the CUTPA claim appears to be set forth in paragraphs 85 through 90 of each of the CUTPA counts. Basically, Sutera alleges that through various means Washton, Segal and Rotella represented that they were a partnership — advertisements, pleadings, letters, envelopes, firm juris number, firm bank accounts. It is then claimed that in June 2002, the plaintiff first discovered that no partnership existed when Segal and Rotella said they were associates of Washton. It is claimed in paragraph 87 that Rotella and Segal knew the representation that they were partners of Washton was untrue and all three made the representation with "the intent of inducing reliance thereon." The plaintiff relied on the representation of a partnership in retaining the defendants and in drafting the present lawsuit (para. 89). In paragraph 90, it states that: "As a result of his reliance on the representation of a partnership as aforesaid, the plaintiff has suffered damages from the defendants' representations as aforesaid." It is undisputed that Attorney Washton died in December 1994. The plaintiff also does not appear to CT Page 3389 contest the fact that the plaintiff had a long-standing relationship with Attorney Washton prior to that attorney entering into a relationship with Attorneys Segal and Rotella. In a deposition taken in 1989, Sutera said Washton had "always been my counsel" and "I don't do anything without talking to Mr. Washton." He started doing business with Washton in 1966 according to a deposition Mr. Sutera gave in August 2002.
In his affidavit, Mr. Sutera says Attorneys Segal and Rotella "participated in meetings with Attorney Washton and myself" on all the four matters involved in the various breach of contract claims: the federal criminal defense, the bankruptcy matter, the alimony matter and the foreclosure case. He goes on to say on multiple occasions Washton told him before any decision was made he would consult with the other two attorneys and "they would reach a decision as a firm." Washton referred to them as his "junior partners." Washton said "his firm" would represent him in the criminal case and file an appeal, "the firm" would challenge all creditor claims in bankruptcy court and would have the alimony payments reduced and "the firm" would take care of the foreclosure matter so he would not lose his house. At oral argument on this matter, counsel for the plaintiff said that Mr. Sutera "relied on Attorney Washton's representations they were partners." He wanted a power house firm, people who were experienced, knew what they were doing and had clout. And he relied on Attorney Washton's representations that all three lawyers were in a partnership when he hired them. In an affidavit attached to the plaintiff's summary judgment motion, Mr. Sutera further represents he wrote checks to "Law Offices Washton, Segal and Rotella." The firm name appeared on letters written in regard to the bankruptcy case and the criminal case. Washton and Attorney Segal entered appearances in the alimony and bankruptcy case. The foregoing claim of a partnership is contested by the defendants.
Both Attorneys Segal and Rotella have submitted affidavits in which they deny that they were partners of Mr. Washton and assert Sutera was Attorney Washton's client. Attorney Rotella denies ever representing Mr. Sutera in any of the matters in issue. Attorney Segal indicates any pleadings he signed were signed because Washton was not available to sign them.
As to Sutera's legal matters, he was only acting in a supporting role. Segal goes on to say that after Mr. Washton's death he never was retained by Sutera to represent him. Attorney Segal goes on to say that while Attorney Washton was alive he specifically told Sutera that neither he nor Rotella were Washton's partners. In a letter and at deposition, Sutera indicated Washton was his lawyer and he never did anything without consulting Washton. In a letter written to Attorney Segal by Sutera after CT Page 3390 Washton's death, Mr. Sutera asked for Segal's help in various matters since Washton's death left him "in a very difficult situation." He asks for Attorney Segal's advice "since you (Segal) were a close associate of (Washton)." From the foregoing different claims, a genuine issue of fact is presented as to whether a partnership or apparent partnership existed here.
It would appear that the gravamen of the CUTPA complaint is that Washton and the three defendants engaged in deceptive acts in trade or commerce because they represented themselves to be in a partnership when, in fact, they were not. Segal and Rotella were associates of Washton not partners. Let us analyze the CUTPA claim.
It would appear that an "ascertainable loss" can be shown assuming a CUTPA action would lie against the defendants. To meet this requirement all that must be shown is that the consumer received something different from what is bargained for, Hinchliffe v. American Motors, 184 Conn. 607,614 (1981); here, the allegation is that the plaintiff thought he was being represented by a partnership but no such partnership existed and he only found out in discovery in 2002 that Segal and Rotella were associates of Washton. Also, the CUTPA claim is not barred by cases likeHaynes v. Yale-New Haven Hospital, 243 Conn. 17, 34 (1997) — the basis of the CUTPA claim does not concern itself with "the non-commercial aspects of lawyering — that is, the representation of the client in a legal capacity." Id. p. 34.
The claim centers on how the lawyers allegedly held themselves out to the community analogous to attorney advertising of the fact that they were partners. Cf. Larsen Chelsea Realty Co. v. Larsen, 232 Conn. 480,496 fn. 19 (1995).
The problem the court has is that § 42-110g (f) of CUTPA setting a three-year limitations period is explicitly an occurrence statute. There apparently is no fraudulent concealment claim here as such a claim would be difficult to make in the CUTPA context under Fichera v. Mine HillCorp. , 207 Conn. 204, 214 et seq. (1988).
Thus, although Fichera did not hold that our fraudulent concealment statute is never applicable to statute of limitations issues in the CUTPA context, it did seem to hold that the so-called self-concealing fraud doctrine of Bailey v. Glover, 88 U.S. 342, 349-50 (1874), should not apply to statute of limitations defenses in a CUTPA case. Fichera suggests that "some affirmative misconduct by the defendants designed to prevent discovery" of the wrong must be shown. Id. 207 Conn. at pp. 214-16. No evidence of affirmative misconduct has been offered here. CT Page 3391
The plaintiff appears to advance the continuous representation doctrine as a means to avert the CUTPA limitations provision. That doctrine has not been accepted yet in our state, but assuming it is adopted and could be held to extend the three-year CUTPA limitations rule, despiteFichera's recognition of the strong legislative policy behind the three-year limit, there is a real question whether the doctrine should apply to the CUTPA claim given the facts of this case. The premise of the continuous representation doctrine "is that the `cause of action' in an attorney malpractice action should not accrue until the attorney's representation concerning a particular transaction is terminated, Gragov. Robertson, 370 N.Y.S.2d 255, 259 (1970); Legal Malpractice 5th ed., Mallen Smith, Vol. 3, § 22.13, p. 430.
The premise of the CUTPA claim is the alleged misrepresentation regarding the business relationship of the defendants; that is, what caused the "harm" — the plaintiff did not get what he bargained for. But the misrepresentation, if any there be, ended in December 1994 when Washton died some seven and a half years prior to the commencement of suit in August 2000. After that point, where does the continuous representation duty lie? It cannot lie with the no longer existed partnership — does it devolve on the individual defendants? But what could the basis of that claim be — their alleged failure to provide adequate representation? But such a claim is not cognizable against attorneys under CUTPA. Is the CUTPA misrepresentation claim viable because of these defendants' failure to disclose that no partnership existed before Washton's death? But what harm was caused by that after Washton died? Perhaps more to the point, such an argument would be an analytical back door attempt to get around Fichera's ruling on the need to show an affirmative effort to conceal to establish a fraudulent concealment claim under CUTPA. In any event, the court concludes the CUTPA claim is not viable and it should be dismissed.
 C.
Fraud
The plaintiff has also made a claim in fraud against each of the defendants. The basis of this allegation is in various ways the defendants gave the appearance or in effect represented to the plaintiff and other prospective clients that they were in a partnership with Attorney Washton. It is further alleged that the defendants intended that people rely on that representation and this plaintiff, in fact, did so in "retaining the defendants" and "drafting the present lawsuit to his detriment" which caused the plaintiff damages. It is further claimed by CT Page 3392 the plaintiff that the plaintiff first discovered from the defendants in June 2000 that, in fact, no such partnership relationship existed. What appears to be alleged is a common law claim for fraud, specifically fraudulent nondisclosure or perhaps fraudulent representation by apparent partnership.
In Carr v. Fleet Bank, 73 Conn. App. 593 (2002), the court summarized the law as follows:
Fraud involves deception practiced in order to induce another to act to her detriment, and which causes that detrimental action . . . The four essential elements of fraud are (1) that a false representation of fact was made; (2) that the party making the representation knew it to be false; (3) that the representation was made to induce action by the other party; and (4) that the other party did so act to her detriment . . .
Id. p. 595. Also see Billington v. Billington, 220 Conn. 212, 217
(1991).
The crux of a fraudulent nondisclosure is a "failure to disclose known facts and . . . a request or an occasion or circumstance which imposes a duty to speak." Duksa v. Middletown, 173 Conn. 124, 127 (1977).
The court will initially discuss the first three elements of the Carr
requirements for fraud.
Was there a false representation here? This element of fraud under theCarr criteria is really predicated on the common law doctrine of partnership by estoppel or apparent partnership. The court in UnitedStates Woodworking v. Lawrence, 89 Conn. 633, said: "A person who holds himself (herself) out as a partner, or permits others to do so, is liable as such to third persons who give credit to the form upon the faith of his (her) connection with it, or who know of such holding out." Id.
p. 643 (cf. 34-54 of General Statutes, repealed in 1997); see discussion inDavies v. General Tours, Inc., 63 Conn. App. 17, 31-32 (2001). Here, it should be a question of fact for the jury as to whether the doctrine of apparent partnership should apply and the court cannot conclude otherwise as a matter of law. As Judge Barnett said in Guillemette v. Gaffney,1996 Ct. Sup. 5864 (NHJD):
Whether there has been a holding out of a person as a partner, so as to estop that person from denying the partnership, is always a question of fact. It must be shown that the person knew of the representation or facts must be found from which the person's knowledge and consent can be fairly inferred. (Morgan v. Fairchild, 58 Conn. 413 (1890) is cited.) CT Page 3393
That a question of fact is raised here is shown by reference to the court's discussion in the section on the CUTPA claim as is further underlined by Sutera's affidavit attached to his motion for summary judgment which is incorporated by reference in the plaintiff's opposition to the defendant's summary judgment motion. In the affidavit, it is noted that the firm name "Law Offices Washton, Segal and Rotella" used the three individual names of the attorneys and had a yellow page advertisement to the same effect. Pleading papers Sutera received had the firm name in the margin. Phone calls to the office were answered by the receptionist using the firm name and the sign outside the office had the firm name printed on it. Letters Sutera received from the firm also had the firm name on the letterhead. The office rooms were arranged so as to suggest a common office, there was one secretary and one fax machine. The court can also take notice of the fact that non-partnership arrangements containing a lead attorney usually present themselves as something similar to "Law Offices of John Smith and Associates."[9]
Despite the foregoing, it is true, as the defendants argue, that: "It is only in exceptional circumstances that fraud can be based on nondisclosure." Greenman v. Rogowski, 152 Conn. 382, 385 (1965). The court goes on immediately thereafter to say: "In an action based on fraudulent nondisclosure, the plaintiff must prove not only the nondisclosure but his (her) reliance on it. See Franchey v. Hannes,152 Conn. 372, 379 . . ." Id. But the latter case, in fact, indicates that the Greenman observation is perhaps too limited a statement of our law in nondisclosure fraud cases; Franchey at one point says that although the general rule is that "silence is not actionable in a transaction in which the parties deal at arm's length, this rule is not operative if "the circumstances or the existence of a confidential relationship gives rise to a duty to speak." 152 Conn. at p. 378.
Here, Sutera alleges in the affidavit attached to his motion for summary judgment that he relied on what to him appeared to be a partnership relationship since Attorney Washton was getting older and had a large case load. Washton represented the defendants were his partners and assured Sutera he would consult with them before making decisions in what were his complex legal matters. The reliance in fact existed as shown by Sutera's writing out checks not to Washton but to the firm. The reliance was reasonable because of the previously mentioned factors referred to in the discussion of apparent partnership and also because the defendants were present during some meetings with Washton. Washton and Segal filed appearances in Sutera's bankruptcy and alimony cases. It is true, as the defendants point out, that Washton represented Sutera for many years and that Sutera regarded Washton as his lawyer and the real CT Page 3394 reason why he retained this firm. But in light of the foregoing discussion, the court cannot say as a matter of law that there was no reliance on the fact of a partnership between Washton and the defendants.
Furthermore, Sutera was dealing with attorneys. By definition, such a relationship creates a confidential connection to the client apart from the issue of whether particular attorneys were acting as partners or associates. Given the fact that there were indicia of a partnership relationship, query whether the defendants had some duty to dispel any false impressions in that regard. See Franchey v. Hannes, supra.
In any event, the court cannot conclude as a matter of law that the first three requirements for common law fraud under Carr have not been met at least at this stage of the litigation even applying the necessary "clear, precise and unequivocal proof" standard of Kilduff v. Adams,219 Conn. 314, 327 (1991).
It is with the fourth requirement — that the plaintiff must have acted to its detriment — that the court has difficulty with.
In other words, mere reliance on a misrepresentation will not suffice to establish common law fraud. A party claiming to have relied on that misrepresentation must show he or she "suffered harm as a result of the reliance." Suffield Development Assoc. v. Nat'l Loan Investors,260 Conn. 766, 778 (2002). That is, "to recover for fraud, as for all torts generally, a plaintiff must allege injury that is the direct and proximate result of the alleged misconduct." Chanoff v. U.S. SurgicalCorp. , 857 F. Sup. 1011, 1017 (D.Conn., 1994). As more explicitly stated in Beik v. Thorsen, 169 Conn. 593 (1975), quoting from other cases, the court said:
It is the general rule that in an action at law for fraud, the plaintiff, to recover, must prove that he (she) has been injured . . . In the ordinary case, this means that the plaintiff must sustain a substantial pecuniary loss . . . In discussing this `fundamental principle of law,' 37 Am.Jur.2d, Fraud and Deceit, 283 states the principle as follows: Thus, fraud, without damage, ordinarily gives no cause of action either at law or in equity. Where the evidence failed to show that the plaintiff suffered any damage at the time of the transaction under the applicable rules of law as to the measure of damages for fraud, it is held that he (she) cannot recover in action for deceit.
Id. pp. 594-95. (Beik cited with approval in Kilduff v. Adams,CT Page 3395Inc., supra at 219 Conn., p. 329.)[10]
It is difficult to perceive how the plaintiff can claim he has suffered a "substantial monetary loss" here because of the fact, standing alone, that the defendants and Washton represented themselves to be in a partnership when that was not true. In his own reliance on a partnership by estoppel or apparent partnership argument to establish the substantive fraud claim and the continuous representation doctrine to thwart a statute of limitations bar, the plaintiff relies in part on the fact that these defendants sat in on some discussions with Washton or took actions indicative of their involvement with his legal problems. That is, there is no claim, for example, that through any misrepresentation as to partnership the plaintiff relied on the fact the defendants would be working on his case or consulting with Washton but, in fact, they did not and the misrepresentation lead him to believe otherwise.
The alleged injury and damages suffered by the plaintiff result from his claim of contractual legal malpractice and that is an entirely separate issue from the issue of how the legal services were delivered to him — by a partnership or by Washton and associates who may have represented themselves to be partners. Perhaps in recognition of the problem, in the 89th paragraph of the fraud count, it says that Sutera in reliance on the "representation of a partnership drafted the present lawsuit, to his detriment." But what does that mean? Does it mean that because of the late disclosure of the fact no partnership existed, he was required to amend the complaint by making claims in common law fraud and a CUTPA allegation? If the court concludes that both legal theories, however, are not viable all of that cannot satisfy the requirement of damages set forth in Beik as a necessary element of common law fraud.
The court will dismiss the fraud allegations.
Conclusion
The court has dismissed all counts against each defendant asserting fraud and CUTPA violations, but has not dismissed the breach of contract counts. As to those counts, the court has not addressed their merits, but has only ruled on the limitations issue.
 Corradino, J. 3-14-03